833 F.2d 468
 Terry Alan BORING, Andrew Calhoun, Weldon Fells, Dale E.
Geidel, Ronald Perry, Bobby Robinson, David Beatty, Philip
Meighan, Prentiss Johnson, on behalf of themselves and all
others similarly situated; Inmates of Allegheny County
Jail, Appellants,
v.
Charles J. KOZAKIEWICZ, Warden, et al.
 No. 86-3710.
 United States Court of Appeals,
Third Circuit.
 Argued June 24, 1987.
Decided Nov. 16, 1987.
 
 Lynn J. Alstadt, (Argued), Thomas R. Shaffer, Michael L. Dever, Pittsburgh, Pa., for appellants.
 Louis C. Long, (Argued), Marshall J. Tindall, Gregory F. Buckley, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for appellees Dr. Howard K. Foster and Dr. Marshall Johnson.
 Cathie J. Fagan, (Argued), Wayman, Irvin & McAuley, Pittsburgh, Pa., for appellees, Kozakiewicz, etc.
 Before GIBBONS, Chief Judge, WEIS, Circuit Judge, and GILES,* District Judge.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The principal issue on this appeal is whether former pretrial detainees seeking damages in constitutional claims for lack of medical care must produce expert testimony to establish that their ailments were serious. The district court required such evidence and in its absence granted a directed verdict in favor of defendants. We will affirm.
 
 
 2
 In addition to the counts under 42 U.S.C. Sec. 1983 alleging failure to provide medical treatment, plaintiffs presented other issues not the subject of this appeal. They were resolved by a jury verdict and no further action has been taken on those matters.
 
 
 3
 The questions before us at this point center on the claims made by three of the plaintiffs--Boring, Perry, and Geidel. Each of these individuals entered the Allegheny County Jail as a pretrial detainee. Each complains of inadequate medical care, but the facts as to the three vary substantially.
 
 
 4
 Boring entered the jail in May 1981. In the preceding three weeks, he experienced pain in his left arm caused by ulnar nerve neuropathy. He had first injured his arm while administering an injection in December 1980, and suffered a reinjury while in the jail. This condition resulted in numbness and spasm of the third and fourth fingers of his left hand and throbbing pain in the left wrist.
 
 
 5
 Three or four days after his incarceration, Boring was seen by defendant Dr. Johnson, the jail physician, who suggested a consultation with a specialist. The consultation ultimately took place at Mercy Hospital in Pittsburgh five months later.
 
 
 6
 According to plaintiff, after receiving a report, Dr. Johnson said that corrective surgery was "elective" and could wait until Boring was released or sent to another institution. In January 1982, about three months after plaintiff was transferred to the Western Penitentiary, he was examined at St. Francis Hospital. Surgery was never performed. He still has pain, but can use his arm on the job that he has held since his release from jail. Another physician, whom plaintiff saw eight times since his release, recommended massage to the point of pain, but this treatment has not alleviated his discomfort.
 
 
 7
 Boring also suffers from seborrheic dermatitis, a scalp condition which causes itchiness and scaling. He protested that although he had requested a specific brand of shampoo, the jail personnel gave him another that had proved ineffective during a previous incarceration.
 
 
 8
 While Boring was in the jail, a dentist replaced old fillings that had fallen out with temporary ones. Boring contends that, as a result, after he was released two of the teeth had to be extracted.
 
 
 9
 Plaintiff Perry was in the county jail from June until October 1981 as a pretrial detainee. He served a six-month sentence there until April 1982. At the time of trial, he was an inmate at a state institution.
 
 
 10
 Perry had periodic attacks of migraine headache. During a previous incarceration at the Western Penitentiary, a low-sodium, non-dairy product diet was prescribed for him. He followed this regimen for periods of three or four days until the headaches subsided. During the summer of 1981, when he asked for this special diet at the county jail, he was told, "We don't give special diets out for anyone, diabetics or anyone." He also denied receiving any medication at the jail when he complained of headaches.
 
 
 11
 Plaintiff Geidel was housed at the jail as a pretrial detainee from March 1980 until his conviction in April 1981 and remained there for one year thereafter. Before admission to the jail, he had been scheduled to undergo exploratory surgery for a knee injury that he had incurred in a childhood accident. When he was unable to make bail, the surgery was cancelled.
 
 
 12
 Two months after entering the jail, while playing handball in the exercise yard, Geidel reinjured the same knee. A nurse at the jail supplied ice to reduce the swelling but refused to give him crutches. Geidel stayed in his cell for three days until he was able to walk on the leg while wearing a knee brace.
 
 
 13
 Geidel introduced in evidence portions of Dr. Johnson's deposition in which he had testified about his suggestion that plaintiff obtain x-rays of the knee at an outside hospital. Geidel refused to have the x-rays taken. Ultimately in October 1983 Geidel had surgery on his knee while incarcerated at a state institution.
 
 
 14
 All of the plaintiffs contended that, because Dr. Johnson had failed to answer their amended complaint, he never denied the allegations against him. During the trial plaintiffs sought to introduce these allegations as admissions, arguing that although the county solicitor had filed an answer on behalf of other defendants, he did not represent Dr. Johnson. The court ruled that at the time the answer was filed Dr. Johnson was represented by the county solicitor and, therefore, the averments in the complaint had been properly denied.
 
 
 15
 At the conclusion of the plaintiffs' case on the health care aspects, the trial judge directed verdicts in favor of the medical personnel. He reasoned that there was no evidence to show that the medical conditions were serious; consequently plaintiffs had failed to meet their burden of proof. The court explained that plaintiffs should have provided expert evidence to show that the conditions for which they had requested treatment were serious.
 
 
 16
 On appeal, plaintiffs argue that the court erred in excluding allegations in the complaint as admissions against Dr. Johnson and in requiring that expert testimony be produced to demonstrate the seriousness of their various injuries and ailments. Alleging that they were indigent and therefore unable to pay for expert witnesses, plaintiffs also contend that the district court erred in refusing to provide funds for that purpose.
 
 I.
 
 17
 We are persuaded that the district court acted within its discretion in ruling that the county solicitor had included Dr. Johnson in the answer filed on behalf of the "county defendants." Dr. Johnson's representation had been somewhat unsettled in the early stages of the litigation, apparently because various insurers were uncertain about his status as a county defendant. He had been employed as the jail physician by the county, and thus was properly considered its employee. Moreover, the answer prepared by the county solicitor responded to a paragraph in the complaint which referred specifically to Dr. Johnson.
 
 
 18
 The district court could reasonably conclude under the circumstances that the doctor was one of the persons on whose behalf the answer had been filed. In addition, we note that plaintiffs had taken Dr. Johnson's deposition and were aware of his defense well in advance of trial. The plaintiffs' contention on this phase of the case must be rejected.
 
 II.
 
 19
 Our review of the medical treatment is complicated by the differences in the plaintiffs' status. Plaintiff Geidel entered the jail and remained there for some months as an unsentenced pretrial detainee. During the latter portion of his confinement, however, he was a convicted prisoner. As a convicted prisoner, the Eighth Amendment's prohibition against cruel and unusual punishment governed the conditions of his medical care. Plaintiffs Boring and Perry, at the times pertinent to this suit, were pretrial detainees.
 
 
 20
 Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir.1976). The Due Process clause requires the government to provide appropriate medical care. City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). As the Court observed in that case, the Due Process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." However, the court found no need at that time to define the extent of the duty to provide medical attention for pretrial detainees. Id. at 244, 103 S.Ct. at 2983. City of Revere, therefore, does not establish the standard which we must apply in the case at hand.
 
 
 21
 The Supreme Court outlined the government's obligations toward pretrial detainees in Bell v. Wolfish, observing that in evaluating complaints, "the proper inquiry is whether those conditions amount to punishment of the detainee." 441 U.S. at 535, 99 S.Ct. at 1872. If an aspect of detention is "reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment'." Id. at 539, 99 S.Ct. at 1874. The opinion cautioned that federal courts should not, "in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations." Id. at 562, 99 S.Ct. at 1886.
 
 
 22
 The protection afforded a sentenced prisoner under the Eighth Amendment was discussed in Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). There the Court said: "Acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" constitute cruel and unusual punishment under the Constitution. The Court emphasized that simple negligence was not the appropriate standard because "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id. Conversely, to prevail on a negligence claim an inmate need not hurdle the constitutional standard of "deliberate indifference" to serious medical needs. Medical malpractice may give rise to a tort claim in a state court but not necessarily to a constitutional claim.
 
 
 23
 Whether the standard for pretrial detainees under the Due Process clause is the same as that articulated in Estelle v. Gamble has provoked various responses by the courts of appeals. In Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir.1985), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), the court held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted prisoners." Id. at 1574. Courts of appeals for the Fourth, Ninth and Tenth Circuits follow the same approach. Whisenant v. Yuam, 739 F.2d 160, 163 n. 4 (4th Cir.1984); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir.1985).
 
 
 24
 Other courts have suggested that the two standards are not identical. In Matzker v. Herr, 748 F.2d 1142, 1147 (7th Cir.1984), the court of appeals said that a pretrial detainee's rights are violated "when a jailer fails to promptly and reasonably procure competent medical aid for a pretrial detainee who suffers a serious illness or injury while confined." That court had used similar language in an Eighth Amendment case, Wood v. Worachek, 618 F.2d 1225, 1233 (7th Cir.1980). See also Alberti v. Klevenhagen, 790 F.2d 1220, 1224 (5th Cir.1986). It is a matter of conjecture whether, in a given factual circumstance, there would be a difference in outcome if the Matzker test, rather than the deliberate indifference test of Estelle v. Gamble, were used.
 
 
 25
 In an earlier case we determined that pretrial detainees are entitled to at least as much protection as convicted prisoners and that decisions interpreting the Eighth Amendment serve as "useful analogies." Hampton v. Holmesburg Prison Officials, 546 F.2d at 1080. In Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979), we concluded that "at a minimum, the 'deliberate indifference' standard of Estelle v. Gamble, must be met" at an institution housing pretrial detainees.
 
 
 26
 In Norris v. Frame, 585 F.2d 1183, 1187 (3d Cir.1978), the court voiced reservations about applying the Eighth Amendment standard to a pretrial detainee and stated that the Fourteenth Amendment "must be read so as to recognize the distinct status of a pretrial detainee: a citizen not yet convicted, yet at the same time not possessing the full range of freedoms of an incarcerated citizen." The continued vitality of Norris v. Frame, however, is questionable in view of the Supreme Court's rejection of its holding in Bell v. Wolfish, 441 U.S. at 524 n. 2, 99 S.Ct. at 1866 n. 2. Norris had cited with approval the test used by the Court of Appeals for the Second Circuit in Wolfish v. Levi, 573 F.2d 118 (2d Cir.1978), the case which was reversed by the Supreme Court in Bell v. Wolfish.
 
 
 27
 The Supreme Court, in Revere v. Massachusetts General Hospital, cited Norris but without indication that the Court accepted its viewpoint. In the same string cite, the Court also listed Youngberg v. Romeo, 457 U.S. 307, 312 n. 11, 102 S.Ct. 2452, 2456 n. 11, 73 L.Ed.2d 28 (1982). Youngberg, however, presents a dramatically different situation, dealing as it does with mentally retarded persons who have not been convicted of a crime or against whom not even a suspicion of criminal activity exists. To apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous.
 
 
 28
 The plaintiffs here, however, are being detained because there has been a finding of probable cause that they committed crimes, a circumstance which permits an extended restraint of their liberty, Bell v. Wolfish, 441 U.S. at 536, 99 S.Ct. at 1872. They may not be "punished" before conviction but the fact that detention "interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement, does not convert the conditions or restrictions of detention into 'punishment'." Id. at 537, 99 S.Ct. at 1873.[1]
 
 
 29
 In Inmates of Allegheny County Jail v. Pierce, we recognized that Norris was not consistent with Bell v. Wolfish, and we found the Estelle v. Gamble standard to be appropriate in evaluating claims that inadequate psychiatric care had been provided in the jail. A similar situation exists here. Nothing in the case before us warrants applying a different standard than that set out in Estelle v. Gamble.
 
 
 30
 The fact that this institution houses convicted prisoners as well as pretrial detainees would pose a practical administrative problem if different standards were to be applied to each group. See Bell v. Wolfish 441 U.S. at 546-47, 99 S.Ct. at 1877-78. As noted above, there is also serious doubt that the result in this case would differ depending on the phraseology of the test employed.
 
 
 31
 Another factor that has a bearing on the appropriate standard is the general expectation that pretrial incarceration is to be relatively brief. Consequently, whether elective surgery should be performed before an inmate's trial or delayed until after he has been released or confined as a convicted criminal is a pertinent consideration. As the court pointed out in Hamm v. DeKalb County, 774 F.2d at 1573, the local government's interest in limiting the cost of detention justifies providing no more than a reasonable level of medical care.
 
 
 32
 It is of some moment, too, that we are confronted with claims for money damages based on alleged constitutional violations. As Estelle v. Gamble makes clear, a determination adverse to plaintiffs on a constitutional ground still leaves them free to pursue a state common law or statutory basis for damages. Plaintiffs here are not pursuing claims based on the common law duty of prison officials toward their prisoners, see 4 W. Blackstone, Commentaries *300, nor have they invoked Pennsylvania statutory provisions. See Pa.Stat.Ann. tit. 61, Secs. 626, 629 (providing for medical treatment in jails).
 
 
 33
 In addition to satisfying the "deliberate indifference" test, Estelle v. Gamble requires that the prisoner must have suffered a "serious illness or injury." As the Matzker court said, "[w]e emphasize 'serious' because we do not hold that minor injuries must receive hospital care to satisfy the due process clause. We limit our holding to injuries which are serious or which the jail authorities have reason to suspect may be serious." 748 F.2d at 1147 n. 3. Norris did not discuss the "serious illness or injury" aspect, and as noted earlier, the general approach used in that case was rejected in Bell v. Wolfish.
 
 
 34
 We come then to the district judge's ruling that because plaintiffs failed to produce expert testimony that their injuries were "serious," plaintiffs failed to meet their burden of proof. In some situations in which the seriousness of injury or illness would be apparent to a lay person, expert testimony would not be required, e.g., a gunshot wound. See City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). However, those circumstances are not present here.
 
 
 35
 Boring's ulnar nerve injury had occurred some months before he entered the jail and the jail physician concluded that surgery to correct the condition was "elective." We cannot say, based on this evidence, that a factfinder would be able to determine that the condition of his arm was "serious." On this record, the need for treatment does not appear to be one that was acute.
 
 
 36
 Boring's scalp condition, even less critical, seems to be little more than an annoyance. Although plaintiff believed a different brand of shampoo would have more effectively controlled the scaling, courts will not "second-guess the propriety or adequacy of a particular course of treatment [which] remains a question of sound professional judgment." Inmates of Allegheny County, 612 F.2d at 762. Similarly, we do not question the dentist's decision to provide temporary fillings during pretrial detention. These complaints merely reflect a disagreement with the doctors over the proper means of treating plaintiff's condition.
 
 
 37
 Geidel's knee disorder was an injury that had occurred years before incarceration. Although he allegedly had planned surgery shortly before his confinement, the evidence again does not establish an acute condition. Rather, the ailment qualified for elective surgery which safely could be deferred for the presumably brief detention period preceding trial.
 
 
 38
 Similar comments apply to Perry's complaints of migraine headaches and his request for a temporary special diet.
 
 
 39
 As laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as "serious." In these circumstances, the district court properly required expert medical opinion, West v. Keve, 571 F.2d 158, 162 (3d Cir.1978), Hampton v. Holmesburg Prison Officials, 546 F.2d at 1081, and in its absence properly withdrew the issue from the jury. See also Hamm v. DeKalb County, 774 F.2d at 1575.
 
 III.
 
 40
 Although plaintiffs complained that the district court wrongfully refused to pay for an expert medical witness, they fail to point to any legislative provision for such funds. Congress has authorized the courts to waive prepayment of such items as filing fees and transcripts if a party qualifies to proceed in forma pauperis. 28 U.S.C. Sec. 1915. However, we have been directed to no statutory authority nor to any appropriation to which the courts may look for payment of expert witness fees in civil suits for damages. Provisions have been made for expert witness fees in criminal cases, 18 U.S.C. Sec. 3006A(e)(1), but not in civil damage suits. See United States v. Rogalsky, 575 F.2d 457 (3d Cir.1978). A prevailing party in a civil rights case is not entitled to tax such fees as costs. Crawford Fitting Co. v. J.T. Gibbons, Inc., --- U.S. ----, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). In these circumstances we cannot fault the district court for not exercising a power it did not possess.
 
 
 41
 The plaintiffs' dilemma in being unable to proceed in this damage suit because of the inability to pay for expert witnesses does not differ from that of nonprisoner claimants who face similar problems. Nonprisoners often resolve that difficulty through contingent fee retainers with provisions for arranging expert testimony. By seeking government funding in this case, plaintiffs are in effect asking for better treatment than their fellow-citizens who have not been incarcerated but who have at least equal claims for damages.
 
 
 42
 The judgment of the district court will be affirmed.
 
 GIBBONS, Chief Judge, dissenting:
 
 43
 The majority has devised for indigent pretrial detainees a nice "Catch 22." There is no provision for furnishing pretrial detainees expert witnesses at government expense; but, without expert testimony, pretrial detainees' complaints that their jailers neglected to provide them with prescribed medical treatment cannot reach the jury. Thus indigent pretrial detainees can never recover for pain and suffering, suffered as a result of neglected medical treatment unless they are released, obtain funds, and can hire an expert. The inhumanity of this paradoxical rule of law alone suggests a serious flaw. If our superiors in the federal judicial hierarchy were to insist upon so inhumane a rule, we would, despite misgivings, have to apply it. The Supreme Court, however, has not suggested it, and this court's caselaw is to the contrary. I dissent.
 
 I.
 
 44
 Terry Alan Boring, Ronald Perry, and Dale Geidel appeal from an order granting a directed verdict in their 42 U.S.C. Sec. 1983 action against certain employees of the Allegheny County Jail. They sought compensation for pain and suffering resulting from the defendants' failure to provide them with medical care. They were, at the time of the events complained of, pretrial detainees, incarcerated only because they were unable to make bail. Had they the resources to make bail, obviously they would have been able to satisfy their medical needs without assistance from the defendants. Thus it was their indigency which placed them in the position of dependency upon their jailers to satisfy those needs; needs appropriately left unattended only when jailers set forth, as they here have not, evidence that the prescribed course of treatment would unduly interfere with overriding state interests.
 
 II.
 
 45
 The issue before us, which the majority's misapplication of Pierce and Bell v. Wolfish attempts to conceal, is whether the directed verdict was proper because the Estelle v. Gamble Eighth Amendment standard is a ceiling rather than a floor for the substantive due process rights of pretrial detainees. It was the trial courts' application of the Estelle v. Gamble standards that produced reversals in Youngberg v. Romeo, City of Revere v. Massachusetts General Hospital, and Norris v. Frame. In each of those controlling cases there was a remand for further proceedings under a more appropriate standard. Those cases compel a like result here, unless we can hold that under even the proper substantive liberty standard the plaintiffs proved no set of facts which would permit a recovery.
 
 
 46
 The government, state or federal, can detain persons to assure their presence at trial, or because they are dangerous to themselves or others, under procedural standards far less rigorous than those required for conviction of a crime. We have held that the constitutional standards for pretrial detention are essentially the same as those for civil commitment of persons in need of treatment. United States v. Perry, 788 F.2d 100 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 218, 93 L.Ed.2d 146 (1986). It is settled that inmates civilly committed for care or treatment are protected by a higher duty of care from their captors than the "deliberate indifference to serious medical needs" test of the Eighth Amendment. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (error to instruct the jury that standard of care for civilly committed was that of Eighth Amendment). After the decision in Youngberg v. Romeo, the Supreme Court in City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), citing Youngberg with approval, reversed the Supreme Judicial Court of Massachusetts' holding that the Eighth Amendment standard applied to pretrial detainees. The Revere opinion, moreover, cited with approval our decision in Norris v. Frame, 585 F.2d 1183, 1187 (3d Cir.1978). In that case Judge Adams, dealing with a pretrial detainee's claim of deprivation of medical treatment, wrote:
 
 
 47
 The protection afforded convicted felons under the eighth amendment is often useful "by analogy" in determining the protection to be afforded detainees under the fourteenth amendment. Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1079-80 (3d Cir.1976). The two levels of protection, however, should not be thought of as co-extensive. Courts have used eighth amendment cases for pretrial detainees because detainees have often alleged that they are confined under conditions worse than those prevailing for convicts. See Detainees of Brooklyn House of Detention for Men v. Malcolm, 520 F.2d 392 (2d Cir.1975); Rhem v. Malcolm, 507 F.2d 333 (2d Cir.1974). In such cases, the eighth amendment standard may be taken as a legitimate starting point because, as this Court noted in Hampton v. Holmesburg Prison Officials, supra, "[i]t would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted." 546 F.2d at 1079-80.
 
 
 48
 However, cases forbidding the imposition on a detainee of conditions or deprivations that would constitute "cruel and unusual punishment" if inflicted on a convict should not be read to limit a detainee only to that level of protection. Although a convict is not wholly stripped of his constitutional rights when he is imprisoned, he is subject to punishment by the state, and part of that punishment is deprivation of his liberty. A detainee on the other hand, may not be "punished" at all. He is entitled to such liberty as does not undermine the legitimate state interest related to his detention. The fourteenth amendment, therefore, must be read so as to recognize the distinct status of a pretrial detainee: a citizen not yet convicted, yet at the same time not possessing the full range of freedoms of an unincarcerated citizen. To limit his constitutional rights to a protection from cruel and unusual punishment would be to rely completely on an analogy to a constitutional provision that is not truly applicable at all. See Ingraham v. Wright, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401 [1412 n. 40], 51 L.Ed.2d 711 (1977); Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).
 
 
 49
 The one legitimate state interest that can warrant a deprivation of a detainee's liberty is the same interest that justifies the detention itself. Thus, this Court has stated that "the only legitimate state interest in the detention of an accused who cannot raise bail is in guaranteeing his presence at trial." Tyrrell v. Speaker, 535 F.2d 823, 827 (3d Cir.1976). Society has found it necessary to confine detainees in cases where there are significant doubts about their appearance at trial. Additional restrictions imposed on detainees are defensible only when they can be justified by the requirements of prison administration, or are inherent in the nature of confinement. If the added burdens do not meet this standard, they violate the detainee's constitutional right to due process of law.
 
 
 50
 585 F.2d at 1187. Thus it is settled in this court, and confirmed by the Supreme Court in Revere, that the Eighth Amendment deliberate indifference standard announced in Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), does not govern the standard of medical care owed to pretrial detainees.
 
 
 51
 Despite the clear holdings in Youngberg v. Romeo, Revere v. Massachusetts General Hospital, and Norris v. Frame, the majority opinion defiantly announces:
 
 
 52
 Nothing in the case before us warrants applying a different standard than that set out in Estelle v. Gamble.
 
 
 53
 The fact that the institution houses convicted prisoners as well as pretrial detainees would pose a practical administrative problem if different standards were applied to each group. See Bell v. Wolfish, 441 U.S. at 546-47 [99 S.Ct. at 1877-78].
 
 
 54
 Maj. op. at 472.
 
 
 55
 With deference, what is in the case before us which requires applying a different standard than that set out in Estelle v. Gamble is the undisputed fact that Boring, Perry, and Geidel were pretrial detainees, not convicted felons, at the time of the deprivations of which they complain. Of course, in order to affirm, the majority must resort to application of the Estelle v. Gamble standard because that is the standard which the trial court applied in granting the defendants' motion for a directed verdict.[1]
 
 
 56
 The trial court's directed verdict ruling, by adopting the Estelle v. Gamble standard and placing on the plaintiffs the burden of satisfying it by expert testimony, ignored the holding in Norris v. Frame, that the burden of justifying the withholding from pretrial detainees of a prescribed medical treatment is on the defendants, and "in order for the prison to defend the means it has chosen, it must first demonstrate that they are means aimed at the proper end: the security interest of the prison." 585 F.2d at 1188. The prison officials in Norris v. Frame argued that denial of access to a prescribed course of treatment was related to guaranteeing Norris' presence at trial or to security of the institution. This court found no evidentiary support for the existence of such a relationship. 585 F.2d at 1189.
 
 
 57
 In support of the grant of the motion for a directed verdict, the majority disingenuously cites this court's opinion in Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir.1979), as if it overruled Norris v. Frame. The Pierce case involved the same dismal Allegheny County institution but was before this court in an entirely different posture, after a trial in which the defendant officials were required to justify, as the law imposes on jail authorities, their treatment of pretrial detainees. Here the officials were relieved of that burden, and thus we are without any factual record as to a legitimate state interest in withholding prescribed medical treatment.
 
 
 58
 In Pierce two medical issues were presented on appeal. One, which the majority does not mention, was continuation of methadone treatment previously prescribed. The court held that the defendants had satisfied the burden of justifying a limitation, though not an elimination, of prescribed methadone treatment inside the jail because of the severe security risk imposed by the presence of drugs in a jail setting. 612 F.2d at 760-61. The second medical issue, to which the majority does make reference, was the level of psychiatric care in the institution. A fair reading of the Pierce court's discussion is that it assumed, arguendo, that at a minimum the Estelle v. Gamble standard applied for purposes of the substantive due process rights of pretrial detainees. 612 F.2d at 762, 763. The actual holding is disregarded by the majority. The Pierce court ruled:
 
 
 59
 The record before us indicates there are substantial deficiencies in the system of psychiatric care at the Allegheny County Jail. Nevertheless, we are not confident that the record accurately reflects existing conditions at the jail. As indicated at oral argument, it does not contain the two reports of the advisor appointed by the district court nor does it reflect the change in conditions caused by the district court's order. Furthermore, the district court did not make a specific finding as to the adequacy of the system for psychiatric care at the jail. We, therefore, remand to the district court for its determination whether the level of psychiatric care meets the constitutional minimum in light of the standards which we have articulated. Should the district court determine that the constitutional requirements have not been satisfied, it will then, of course, order such relief as it finds is required.
 
 
 60
 612 F.2d at 763. The holding on the psychiatric care issue deals not with the withholding of a prescribed medical treatment, but with the entirely distinct question whether the jailers have an affirmative duty to make psychiatric examinations and prescribe treatments. The Pierce opinion quite plainly suggests that in some cases they do. That, however, is not an issue presented in this case. Here the diagnosis and prescriptions were already made, and the defendants were, by the directed verdict, relieved of the Norris v. Frame burden of justification of withholding the prescribed treatments. The burden of justification announced in Norris v. Frame could not have been changed in Pierce because the case was before this court after a full trial on the merits.
 
 
 61
 The majority also cites Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978). As in Pierce, that case was before the appellate courts on a full record made by affidavits in support of a motion for partial summary judgment, or after trial. See United States ex rel. Wolfish v. United States, 428 F.Supp. 333, 439 F.Supp. 114 (S.D.N.Y.1977). Thus that case cannot be read as casting any doubt upon the Norris v. Frame allocation of the burden of justification. Nor did Bell v. Wolfish present the appellate courts with the occasion to consider the precise issue presented here: the justification for withholding medical treatment. What is clear in Bell v. Wolfish, however, is that the court identified as legitimate governmental interests the same two interests that Judge Adams identified in Norris v. Frame: assuring the detainee's presence at trial, and maintaining security of the institution. 441 U.S. at 540, 99 S.Ct. at 1874.
 
 
 62
 On the record before us, however, no effort was made by the defendants to show that the withholding of the medical treatments which Boring, Perry and Geidel sought was related to securing their presence at trial, or to the security of the Allegheny County Jail. Indeed, such evidence as is in the record in the plaintiffs' case suggests that medical treatment has sometimes been furnished, inside and outside the jail, without interference with the two legitimate state interests identified in Norris v. Frame. Not surprisingly, then, the majority relies on unidentified "practical administrative problems" as a justification for applying the punishment standard of the Eighth Amendment. Maj. op. at 472.
 
 
 63
 The "practical administrative problems" amount to this: Allegheny County chooses to confine pretrial detainees and convicted prisoners in the same facility; ergo, Allegheny County can subject pretrial detainees and convicted prisoners to the same regimen in confinement. That defective syllogism was rejected in Norris v. Frame, which recognized the constitutionally significant fact that the sole purpose of pretrial confinement of state prisoners is the assurance of their presence at trial. Thus Norris v. Frame, while articulating the need for a balancing of the detainees' liberty interests and those of the state, made it clear that only state interests which could legitimately be taken into account were those which justified the pretrial detention in the first place. The unarticulated "practical administrative problems" to which the majority opinion refers simply have no place in the equation, even if evidence had been offered which identified them.
 
 III.
 
 64
 Two parts of the majority opinion require special mention, for they further disclose the warped prism through which the majority views this record. First, in attempting to denigrate the reference in City of Revere v. Massachusetts General Hospital to Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the opinion reasons:
 
 
 65
 Youngberg, however, presents a dramatically different situation, dealing as it does with mentally retarded persons who have not been convicted of a crime or against whom not even a suspicion of criminal activity exists. To apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous.
 
 
 66
 Maj. op. at 472. The reference to the "suspicion of criminal activity" lets the cat out of the bag, disclosing the majority's bias against the hoary presumption of innocence, a bias which has led to strained efforts to sustain an unsustainable directed verdict. Moreover, the majority fails to note that in Rennie v. Klein, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), the Supreme Court remanded to this court for reconsideration in light of Youngberg a case involving an involuntarily committed person about whom there was a good deal more than a suspicion of criminal activity. See Rennie v. Klein, 720 F.2d 266 (3d Cir.1983) (en banc). There has been no previous intimation that pretrial detainees are entitled to fewer substantive protections of their liberty than are insane detainees, and the logic of that proposition is hardly self-evident.
 
 
 67
 Equally revealing is the majority's attempted justification for the rule requiring expert testimony.
 
 
 68
 The plaintiffs' dilemma in being unable to proceed in this damage suit because of the inability to pay for expert witnesses does not differ from that of nonprisoner claimants who face similar problems. Nonprisoners often resolve that difficulty through contingent fee retainers with provisions for arranging expert testimony. By seeking government funding in this case, plaintiffs are in effect asking for better treatment than their fellow citizens who have not been incarcerated but who have at least equal claims for damages.
 
 
 69
 Maj. op. at 474. In this case that argument is outrageous sophistry. The need for expert testimony arises here only because the district court has adopted, for pretrial detainees, the Estelle v. Gamble punishment standard, requiring them to prove a serious medical need. Their fellow citizens who are not incarcerated can satisfy any medical need, serious or not, by walking to a hospital or a doctor's office. The medical needs of indigents are met through various forms of public assistance, and on this record there is no basis for presuming that such public assistance would not have been available to the plaintiffs had they been permitted to avail themselves of it. The suggestion that the plaintiffs are seeking better treatment than their fellow citizens who are not incarcerated is simply preposterous.
 
 IV.
 
 70
 The district court's ruling, and that in the majority opinion, as to the need for expert medical testimony, are both predicated upon the false premise that the "deliberate indifference to serious medical needs" test of Estelle v. Gamble must be satisfied. Indeed, the majority is explicit in this respect: an expert opinion is required before a factfinder can determine that a condition is "serious." Maj. op. at 473. Boring, Perry and Geidel all contend that evidence of record satisfies that test. I do not reach the merits of plaintiffs' contention because neither the district court nor the defendants contend that expert testimony would be required under a standard less rigorous than that of the Eighth Amendment. I do not read the majority opinion to suggest otherwise.
 
 
 71
 We are, on this record, dealing with the knowing and deliberate withholding of requested medical treatment. Negligence issues with respect to the standard of care owed to detainees by their captors are thus not presented. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Rather, the sole question is whether Boring, Perry, or Geidel, made out a prima facie case under the lowest standard found in Daniels v. Williams, that of intentional action. 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662; Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). The facts as to each plaintiff must be separately discussed, since their claims are individual.
 
 
 72
 This is an appeal from a directed verdict, and thus in exercising plenary review we must look at the evidence in the light most favorable to the opponents of that relief. See Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).
 
 A. Boring
 
 73
 The evidence establishes that Boring entered Allegheny County Jail in May of 1981 as a pretrial detainee--his status at the time the complaint was filed. At the time of Boring's admission he was experiencing numbness and spasming of the third and fourth fingers on his left hand and an intense throbbing pain in his left wrist. He testified that at that time the pain was so severe he could not reach for a book from a library shelf. Three or four days after his incarceration, Boring was seen by Dr. Johnson, who determined that he had an ulnar nerve neuropathy.[2] Dr. Johnson recommended that Boring receive a consultation at Mercy Hospital or Western Penitentiary, both in Pittsburgh. He prescribed anti-inflammatory medicine for Boring's problem.
 
 
 74
 After several subsequent requests by Boring for the promised consultation, Dr. Johnson arranged for one to take place at Mercy Hospital in October of 1981. From the fact that this consultation outside the Allegheny County Jail was arranged, the jury could reasonably infer that treatment outside the jail did not impinge in any significant way upon the state's interest in Boring's availability for trial, or the security of the jail.
 
 
 75
 The physicians at Mercy Hospital recommended that surgery be performed on Boring's left arm. Boring requested Dr. Johnson to arrange such surgery. He refused to do so, reasoning that although the surgery was recommended, he considered it elective. Thus he determined that it should wait until Boring was released or transferred to another institution. This, Dr. Johnson testified, "is the procedure at the Allegheny County Jail for elective surgery." He did not define "elective surgery." Dr. Johnson testified that the procedure at Allegheny County Jail was to have "emergency" surgery performed at Mercy Hospital. He did not define "emergency" surgery. The jury could reasonably infer that "emergency" surgery included only surgery for life threatening conditions. The surgery Boring sought, therefore, was not permitted, despite his request.
 
 
 76
 In January of 1982 Boring was transferred to Western Penitentiary and made a renewed effort to have his ulnar nerve neuropathy corrected. The doctors at St. Francis Hospital, where he was sent from Western Penitentiary, did not perform surgery for reasons which, because of an evidentiary ruling, are not disclosed in this record. The only treatment currently available is massage at the point of pain to stimulate the nerve. Boring's arm still gives him intense pain.
 
 
 77
 In addition to the ulnar nerve neuropathy in his left arm, Boring testified, he suffers from seborrhea dermatitis, a skin condition that results in itchiness and scabbiness of the scalp. Seborrhea dermatitis can travel to other parts of the body, if left uncontrolled. Before his pretrial incarceration, Boring had been treated for the dermatitis with a prescribed medicated shampoo. He requested the prescribed medication, but was given another, ineffective shampoo. When he complained, he was told "you have to use this, this is all we have."
 
 
 78
 Finally, Boring testified that he had dental problems while at Allegheny County Jail. Dental care was provided by one dentist who visited the jail three times a week. Boring saw this dentist six times. He contends that the dentist only provided him with temporary fillings that kept falling out, rather than with permanent fillings. Eventually, two of the teeth which were filled with temporary fillings had to be extracted.
 
 
 79
 From the evidence a jury could find: (1) that the officials in charge of inmate medical problems at the Allegheny County Jail were informed of two prescribed medical treatments, surgical correction of ulnar nerve neuropathy, and a specific medicated shampoo for seborrhea dermatitis; (2) that no reason related to jail security or to Boring's availability for trial would have prevented these treatments; (3) that the treatments were knowingly withheld; and (4) that Boring suffered unnecessary pain and some permanent injury as a result. There is no evidence that the prescribed treatments were medically inappropriate. Indeed, Dr. Johnson's testimony suggests the contrary.
 
 
 80
 The evidence with respect to Boring's complaints about dental care is different in one important respect. While there is record evidence that a medical treatment for his ulnar nerve problem and for his seborrhea dermatitis had been prescribed by competent medical authorities, there is no evidence that any dentist ever prescribed any course of treatment other than the series of temporary fillings which were furnished.
 
 B. Perry
 
 81
 Perry suffers from migraine headaches. He became a pretrial detainee at Allegheny County Jail after having been arrested as a parole violator. Perry had previously been incarcerated at Western Penitentiary, where he suffered migraine attacks. Doctors there prescribed a medication and a special diet, low sodium, and no milk, which afforded relief. When he experienced a migraine attack at Allegheny County Jail he informed the medical officials of the previously prescribed medication and the special diet. The physicians in charge would not prescribe the medication and the jail would not provide the special diet. According to Perry, Dr. Johnson said the migraine would go away, and he was not even given aspirin. The migraine headaches continued during his pretrial detention.
 
 
 82
 As with Boring's ulnar nerve problem and his dermatitis, the jury could find (1) that the medical officials had knowingly refused to provide a medically prescribed treatment; (2) that no reason relating to jail security or Perry's availability for a hearing on his parole violation would have prevented those treatments; and (3) that Perry suffered unnecessary pain as a result.
 
 C. Geidel
 
 83
 At the time of Geidel's incarceration as a pretrial detainee he was already scheduled for surgery on his right knee by Dr. Pessalano at Shadyside Hospital as a result of a motorcycle crash. He wore a knee brace. He did not immediately inform the jail medical officials of the scheduled surgery. He was not given any physical examination. Two months after his admission, Geidel injured his right knee playing handball. He was taken to the jail infirmary where ice and an ace bandage were provided. He requested a pair of crutches from the attending nurse, but his request was denied. Since he was unable to walk, friends carried him to his cell, where he remained for three days until he was able to walk with the knee braced and wrapped.
 
 
 84
 Geidel was examined by Dr. Johnson. He informed Dr. Johnson that he had been under Dr. Pessalano's care for the knee injury, and was scheduled for surgery at Shadyside Hospital. He asked if Dr. Pessalano could come in and "consult and examine the leg and see how much more damage I have done to it or if it can be correct, or whatever the problem was." Dr. Johnson told Geidel that he would arrange to have him transported to a hospital for x-rays. He was never sent for x-rays. Geidel told Dr. Johnson he could obtain x-rays from Dr. Pessalano, but none were obtained.
 
 
 85
 After Geidel was transferred to the Huntington State Correctional Institution as a convicted prisoner, that institution arranged for corrective surgery on his knee at the J.C. Blair Memorial Hospital in Altoona, Pennsylvania. In the meantime, while he was at Allegheny County Jail, he hobbled around that institution, suffering pain.
 
 
 86
 From the evidence the jury could find (1) that two physicians, one before Geidel's incarceration and another thereafter, prescribed necessary knee surgery; (2) that the medical officials were aware of the first prescription; (3) that they never obtained the x-rays which would be necessary for any different diagnosis; (4) that they never made any different diagnosis; and (5) that Geidel suffered unnecessary pain while he was denied the necessary knee surgery.
 
 IV.
 
 87
 It is clear to me that Boring has made out a prima facie case that the jailers intentionally denied him prescribed treatment, without sufficient reason, on his ulnar nerve and dermatitis problems. Perry has made out a prima facie case that the jailers intentionally denied him prescribed treatment, without sufficient reason, on his migraine headache problem. Geidel has made out a prima facie case that the jailers intentionally denied him prescribed treatment on his knee problem. It is clear, moreover, that the trial court, by wrongly applying the Eighth Amendment's "deliberate indifference to serious medical needs" test, relieved the defendants of the burden of justification for such intentional deprivations which our Norris v. Frame holding imposes. For this reason the judgment appealed from cannot stand.
 
 
 88
 The jail officials have not in any way demonstrated, as they must, that their deprivations herein related to the only state interests relevant to pretrial detainees--attendance at trial or the security of the institution. A pretrial detainee, who could receive a prescribed course of treatment except for his incarceration, should receive it unless the state satisfies its burden of justification that the course of treatment would unduly interfere with those state interests. Hence, the plaintiffs should, as a matter of law, have recovered if the state officials offered no other evidence.
 
 
 89
 Thus I would reverse and remand for a new trial.
 
 
 
 *
 The Honorable James T. Giles, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The dissent in referring to a "bias against the hoary presumption of innocence" fails to consider the discussion in Bell v. Wolfish. There, the Court defines the presumption of innocence as "a doctrine that allocates the burden of proof in criminal trials.... It has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun." 441 U.S. at 520, 99 S.Ct. at 1862
 
 
 [1]
 Counsel for the defendants relied on Estelle v. Gamble in making the motion for a directed verdict, and the court adopted the deliberate indifference standard. A369
 
 
 [2]
 Dr. Johnson testified that the ulnar nerve, which controls the fourth and fifth fingers of the hand, was displaced, and that surgical correction could have been arranged at West Penn Hospital