PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4057
_____

LEONARD G. YOUNG, JR.,
                                        Appellant

v.

JEFFREY MARTIN, DEPUTY SUPERINTENDENT
GREENE SCI, in his official and individual capacity; LOUIS
S. FOLINO, SUPERINTENDENT GREENE SCI, in his
official and individual capacity; MAJOR LORINDA
WINFIELD; CAPTAIN ANTHONY GUMBAREVIC, in his
official and individual capacity; CO #1 MOODY, in his
official and individual capacity
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 2-10-cv-00284)
Magistrate Judge:  Honorable Cynthia R. Eddy
_____

Argued:  October 29, 2014

Before:   MCKEE, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges.*

(Filed: September 8, 2015)
_____

Elizabeth F. Collura
Robert J. Ridge (Argued)
Clark Hill
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15219
        *Counsel for Appellant*


Sandra A. Kozlowski
Kemal A. Mericli (Argued)
Office of Attorney General of Pennsylvania
564 Forbes Avenue
Pittsburgh, PA 15219
        *Counsel for Appellees*
_____


OPINION OF THE COURT
_____


KRAUSE, *Circuit Judge*.

Leonard G. Young, Jr., a Pennsylvania prisoner with a long history of mental illness, filed suit alleging that Appellees-Defendants[1] violated his Eighth Amendment rights

_____

[1] Appellees-Defendants include Jeffrey Martin, Deputy Superintendent Greene SCI, in his official and individual

by securing him in a four-point restraint chair, naked, for fourteen hours, although he did not pose a threat to himself or others. Because we agree with Young that the District Court erred as a matter of law in granting summary judgment against him, we will vacate the judgment and remand for further proceedings.

## I. Factual Background

For over six years, Young has been held in solitary confinement, housed in either the Restrictive Housing Unit ("RHU") or the mental health unit of different Pennsylvania prisons because of his extensive disciplinary history and history of mental illness. Since childhood, Young has been diagnosed with various forms of mental illness, including bipolar disorder and schizoaffective disorder. However, since his detention over these past several years in solitary confinement, consisting of isolation for 23 hours per day and one hour of recreation time in a solitary pen on weekdays, Young's symptoms of mental illness have intensified, including visual and auditory hallucinations, paranoid thoughts, throwing and smearing his own feces, episodes of self-harm, and suicidal impulses. Indeed, since living in these conditions of prolonged isolation, his numerous suicide attempts have included efforts to hang himself and to break his own neck by banging his head against the wall.

---

capacity; Louis S. Folino, Superintendent Greene SCI, in his official and individual capacity; Major Lorinda Winfield; Captain Anthony Gumbarevic, in his official and individual capacity; CO #1 Moody, in his official and individual capacity, and referenced as "Defendants" throughout this opinion.

3

On the evening of September 20, 2009, while Young was confined in the RHU at State Correctional Institution ("SCI")-Greene, his cell door was mistakenly unlocked and left open by a Corrections Officer ("CO") in the control room. He exited his cell, walked up the stairs to the second tier of the RHU, and seated himself on an internal ledge above the law library. What next transpired was captured in the ordinary course by prison surveillance cameras and handheld video cameras operated by COs.[2]

When other inmates saw Young on the roof they began calling to him from their cells. In the meantime, Lieutenant Kirby and a group of COs gathered on the floor below Young. From his perch, Young shouted that he was protesting for prisoners' rights and for the return of some of his property. Two COs watching Young from the balcony chatted with each other and laughed as he talked. Young remained crouched on the roof voicing his complaints for approximately seven minutes before following the COs' orders to step back onto the second tier and to close himself inside the shower. Once there, he again complied with orders, placed his hands behind his back, and pushed his forearms through the shower tray slot so the COs could handcuff and then remove him, secured, from the shower. As the COs escorted him to the stairs, Young passively refused to walk by laying down on the ground. His ankles then were

_____

[2] The facts set forth here are drawn from the video and documentary evidence of record. In reviewing a grant of summary judgment, we must draw all reasonable inferences in favor of the nonmoving party; we therefore set forth the facts in the light most favorable to Young. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 415 (3d Cir. 2011).

4

shackled and the COs carried him down the stairs. Young again passively refused to walk when they reached the bottom of the staircase. At no time throughout this incident did Young verbally threaten or attempt to physically engage any of the COs.

After the COs carried Young to a nearby corridor and placed him face down on the ground with his hands and ankles cuffed, four COs stood over him and further restrained his limbs. Young remained motionless on the ground and did not struggle during this process. However, rather than asking Young to submit to a routine strip search and although he had not spit on anyone, the COs placed a spit mask on him and cut off Young's clothes to perform a prone strip search.[3] Young complained but did not physically resist the search; no contraband was found.

After the search was complete, Young, naked, cuffed, and compliant, was hoisted to his knees and photographed for several minutes to record any injuries he may have sustained during the incident. While the pictures were taken, Lieutenant Kirby left the scene to obtain the requisite authorization for placing Young in a four-point restraint chair. Young repeatedly asked why he was going to be placed in a restraint chair, but received no answer.[4] When the restraint

---

[3] As a matter of prison policy, a strip search is performed after an inmate escapes from his cell to ensure that he did not acquire any contraband.

[4] In a videotaped debriefing immediately following Young's placement in the observation cell, Lieutenant Kirby acknowledged that Young was secured by the COs after Young stepped into the shower but went on to say that he was

chair arrived, he was strapped into it, naked, and a smock was placed over his lap. Again, Young did not physically resist the COs but he did object to his treatment. He complained several times that the restraints were too tight and he cried out in pain while being strapped into the chair and again when he was wheeled to a psychiatric observation cell. Young also repeatedly asked that the smock on his lap be adjusted to fully cover his genitals, but the COs refused to comply with his request.

At approximately 8:46 p.m., Young was wheeled into the air-conditioned cell and left naked, except for the smock on his lap. Upon his arrival, a nurse determined that his straps were too tight and loosened them accordingly. As reflected in the reports generated over the time he spent in the psychiatric observation cell, medical personnel continued to

placed in the restraint chair due to the seriousness of his actions. Written reports prepared after the incident also state that Young was placed in the restraint chair "due to his actions," J.A. 314, and that "due to [the] seriousness of [his] actions and blatant disregard for potential injury to himself or staff that inmate Young would be [p]laced in the restraint chair to prevent him from harming himself or staff. This was authorized by the [s]hift commander prior to placement," J.A. 312. A different report states that "[d]ue to the serious[] nature of the inmate[']s actions, and his continued refusal of orders, Capt. Gumbarevic determined that the inmate should be placed into the restraint chair for his protection. After conferring with Dep. Martin, and Act. Supt. Capozza, restraint chair placement was authorized." J.A. 308.

6

monitor Young's condition.  Around 11:00 p.m., Young told a nurse that he wanted to move his hands "a bit" and was "talkative and joking [with] staff in no distress" or pain.  J.A. 193.  Young fell asleep in the chair sometime after 1:20 a.m. and woke up at 5:20 a.m., requesting "a shot in the ass" of pain medication.   J.A. 193, 196.   He was "cooperative," agreed to see a psychiatrist and take medication, and lamented the "next time" he would be in the restraint chair because "that's just how it is [with him]."  J.A. 196.

Later in the morning, Young was still naked in the chair and became agitated because of his continued restraint. Upset, he told the COs that he would "act out" when released. J.A. 604.  Because he was "loud" and "making demands," prison officials declined to remove him from the restraint chair.  J.A. 196.  He was finally released a couple hours later once officials were satisfied that he had calmed down.

All told, Young was confined in the restraint chair from approximately 8:46 p.m. to approximately 10:30 a.m. the next morning—a nearly fourteen-hour period that significantly exceeded the two-hour maximum recommended by the chair's manufacturer and the eight-hour maximum, absent special authorization, permitted by the prison's regulations. *See* J.A. 180.  Upon release, Young was shaking uncontrollably and repeatedly complained that he was "cold down to his bones" because of the air conditioning blowing on his naked body for fourteen hours.  J.A. 287.  His legs were so numb that he could not walk, and he had to be wheeled back to the RHU in the chair.[5]  As Defendants'

---

[5] Young's cell door was inadvertently opened again on September 22, 2009.   From the surveillance video, it is unclear whether he fell out of his cell or ran out.  Regardless,

7

counsel conceded at oral argument, there is no evidence in the record that anyone provided the requisite authorization to exceed the prison's eight-hour maximum. Oral Argument at 44:01-49:49, *available at* http://www2.ca3.uscourts.gov/oral argument/audio/13-4057Youngv.Martin,%20et.al.mp3.

## II.     Procedural Background

Young initiated suit in March 2010 and, in August 2010, filed an amended complaint, claiming, among other things, that his placement in the restraint chair was purely punitive and constituted excessive force in violation of the Eighth Amendment. The Defendants moved for summary judgment, arguing that their actions were justified by Young's extensive disciplinary history. In addition, Young filed a motion to stay the proceedings pending the outcome of an investigative report by the Department of Justice ("DOJ") regarding the treatment of mentally ill prisoners in the Pennsylvania prison system and also requested that the District Court provide him with funding for a mental health expert.

---

most of the reports of the incident state that he "lunged" at Officer Biagini, who was just outside the cell, J.A. 404, and that Officer Biagini was not harmed by Young. Following the incident, Young was strip searched and returned to his cell. Young's Eighth Amendment claim is not based on this incident. He references it to demonstrate that the COs' response on September 20th involved the use of excessive force because, following the arguably more serious event on September 22nd, he was not placed in the restraint chair and instead was returned to his cell in the RHU.

8

The District Court granted the Defendants' motion for summary judgment, denied Young's motion to stay, and declined to allocate funds for an expert. Focusing on Young's "paramount claim" that "Defendants violated his Eighth Amendment rights by subjecting him to a prolonged period of strict mechanical restraint in the restraint chair," the District Court concluded that the "Defendants acted professionally and within constitutional parameters in subduing and placing Plaintiff in a restraint chair for about fourteen hours . . . ." *Young v. Beard*, Civ. No. 10-0284, 2013 WL 5230796, at *8, *11 (W.D. Pa. Sept. 17, 2013). Specifically, the District Court found that Young was "agitated" and the Defendants brought him "under control using minimal force" especially since he indicated he would "act out" when released and he was "violence-prone," mentally ill, and suicidal. *Id.* at *11. The District Court also found the record lacked evidence that Young suffered "actual harm," let alone "any risk of 'serious' harm, considering not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but any evidence that unwilling exposure to that risk violate[d] contemporary standards of decency." *Id.* at *12. The District Court therefore concluded that the Defendants did not use excessive force and granted the Defendants' motion for summary judgment. Young timely appealed.

9

## III. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331.[6] We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting summary judgment, applying the same standard as the district court. *See Tri-M Grp.*, 638 F.3d at 415. We will affirm only if "drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(a). If, on the other hand, "reasonable minds could differ . . . [then] an issue of material fact remains . . . for the trier of fact, and the grant of summary judgment . . . must be reversed." *J.E. Mamiye & Sons, Inc. v. Fid. Bank*, 813 F.2d 610, 617 (3d Cir. 1987) (citations omitted).

## IV. Analysis

The main issue presented on appeal is whether the District Court erred by granting summary judgment in favor of the Defendants by concluding that they did not violate Young's Eighth Amendment rights when they strapped him in a restraint chair, naked, for fourteen hours, in the absence of any imminent threat of bodily harm to himself or others. Young argues that his placement in the restraint chair constituted use of "excessive force," relying on the Supreme

---

[6] The parties consented to the Magistrate Judge's jurisdiction pursuant to 28 U.S.C. § 636(c)(1). For ease of reference, we refer to the District Court throughout.

10

Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002).[7] Appellant's Br. 31. The Defendants argue that we should analyze this as a "conditions of confinement" case under *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000). For the reasons set forth below, we conclude that the District Court erred in granting summary judgment because it did not analyze the case under *Hope* and failed to draw all reasonable inferences from the facts in Young's favor.

### A.    The Applicable Eighth Amendment Framework

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). The Supreme Court has interpreted this prohibition both to bar prison officials from using excessive force against inmates, *see Hudson v. McMillan*, 503 U.S. 1, 6-7 (1992), and to impose affirmative duties on prison officials to "provide humane conditions of confinement," *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Depending on which of these Eighth Amendment claims a plaintiff seeks to pursue, different elements must be proven and different lines of cases applied. While claims of use of excessive force require consideration of "the need for the application of force, the relationship between the need and the amount of force that

---

[7] He also relies on *Giles v. Kearney*, 571 F.3d 318, 326-27 (3d Cir. 2009), where we reversed a grant of summary judgment on a prisoner's claim of excessive force. While *Giles* also analyzes the use of force on a prisoner who was already subdued, it is of limited applicability as it does not address *Hope* or the use of restraint chairs or other mechanical restraints.

11

was used, and the extent of injury inflicted," *Whitley*, 475 U.S. at 321 (citation and internal quotation marks omitted), claims concerning conditions of confinement require a plaintiff to show that the prison conditions "pos[ed] a substantial risk of serious harm" and that the prison officials were deliberately indifferent to that risk, *Farmer*, 511 U.S. at 834.

The parties dispute whether Young's claims regarding the use of the four-point restraint chair, i.e., a mechanical restraint, fall into the category of excessive force or conditions of confinement, and, as one district court has observed, our "[c]ase law does not provide a clear answer for which analysis applies." *Zimmerman v. Schaeffer*, 654 F. Supp. 2d 226, 248 (M.D. Pa. 2009). We last addressed the issue of whether the use of a restraint chair constituted an Eighth Amendment violation in *Fuentes*. However, that case, decided before *Hope*, is distinguishable on its facts and left open the issue of whether the use of mechanical restraints should be analyzed under the Supreme Court's excessive force or conditions of confinement jurisprudence.

In *Fuentes*, the inmate began kicking his cell door and yelling for a CO, while complaining that another inmate urinated in his cell. 206 F.3d at 339. The COs cuffed Fuentes through his food slot and entered his cell to conduct a search. *Id.* A struggle ensued, and the COs eventually wrestled Fuentes to the floor. *Id.* Fuentes continued to yell while one CO held him on the ground as another cuffed his legs. *Id.* At the same time, the Assistant Warden authorized use of the restraint chair for eight hours, in accord with the prison's regulations. *Id.* at 339, 340. Fuentes argued that use of the restraint chair was purely punitive and violated his Eighth Amendment rights because he was no longer a threat

12

once he was restrained. *Id.* at 340, 343-44. Because it was "undisputed that the prison policy for the use of the restraint chair was followed," we concluded that the prison officials were not deliberately indifferent to Fuentes's health or well-being, consistent with a conditions of confinement analysis. *Id.* at 345. We also concluded that the prison officials did not place Fuentes in the chair "maliciously and sadistically to cause harm," consistent with an excessive force analysis. *Id.* at 345-46.

Despite some facial similarities to Young's case, the facts of *Fuentes* are sufficiently different that its holding is of limited applicability here for three reasons. First, Fuentes' placement in the restraint chair occurred contemporaneously with the physical altercation with the COs. That is, the chair was an instrument used by prison officials to subdue an actively combative prisoner. In contrast, Young never engaged in a physical altercation and was placed in the restraint chair while entirely docile.

Second, Fuentes' placement in the restraint chair was in accord with prison regulations, as he posed an immediate threat to the COs, and he was released after eight hours. Young, on the other hand, was not an immediate threat to himself or others, as he was shackled and face down on the ground, and there is no evidence that any prison official authorized Young's confinement in the restraint chair in excess of the eight-hour maximum otherwise permitted under the prison regulations. *See* Oral Argument at 44:01-49:49, *available at* http://www2.ca3.uscourts.gov/oralargument/ audio/13-4057Youngv.Martin,%20et.al.mp3.

Finally, *Fuentes* does not answer the question of what legal framework applies in the face of a claim that the use of

13

mechanical restraints violated a prisoner's Eighth Amendment rights. *See Zimmerman*, 654 F. Supp. 2d at 249 ("The Third Circuit has not since considered the constitutionality of mechanical constraints, but to the extent that *Fuentes* . . . conflict[s] with *Hope*, the Supreme Court case is binding authority."). The Supreme Court's more recent decision in *Hope*, however, does.

In *Hope*, the Supreme Court specifically addressed the issue of whether the use of mechanical restraints constituted cruel and unusual punishment. Larry Hope, an Alabama prisoner, fell asleep during a "morning bus ride to [his] chain gang's worksite." *Hope*, 536 U.S. at 734. He "was less than prompt in responding to an order to get off the bus" and eventually got into a "wrestling match with a guard." *Id.* Hope was handcuffed, placed in leg irons, and transported back to the prison where he was cuffed on a "hitching post." *Id.* "The guards made him take off his shirt, and he remained shirtless all day while the sun burned his skin." *Id.* at 734-35. He was chained to the post for seven hours and was given water only once, denied bathroom breaks, and taunted by the guards. *Id.* at 735.

After noting that "unnecessary and wanton inflictions of pain are those that are totally without penological justification," the Supreme Court concluded that, on the facts alleged by Hope, "the Eighth Amendment violation is obvious." *Id.* at 737-38 (internal quotation marks and citation omitted). The Court explained:

> Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg irons,

14

and transported back to the prison. He was separated from his work squad and not given the opportunity to return to work. Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation. The use of the hitching post under these circumstances violated the "basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." *Trop v. Dulles,* 356 U.S. 86, 100 (1958). This punitive treatment amounts to gratuitous infliction of "wanton and unnecessary" pain that our precedent clearly prohibits.

*Id.* at 738 (footnote omitted).

The Defendants do not dispute that *Hope* controls as to which Eighth Amendment test applies to analyze the use of mechanical restraints. *See Zimmerman*, 654 F. Supp. 2d at 249 (*Hope* is the controlling case on the "constitutionality of mechanical restraints"). They contend, however, that the Supreme Court in *Hope* "applied the conditions of confinement/deliberate indifference test of *Farmer v. Brennan*." Appellees' Br. 34-35. We disagree because the language and reasoning of the opinion reflect that the Court, in fact, was applying the excessive force test.

15

After reciting the facts, the Supreme Court reaffirmed that "unnecessary and wanton infliction[s] of pain . . . constitute[ ] cruel and unusual punishment," including those that are "totally without penological justification." *Hope*, 536 U.S. at 737 (quoting *Whitley*, 475 U.S. at 319 and *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)) (internal quotation marks omitted). The Court referred to *Farmer* briefly but its analysis of whether the use of mechanical restraints violated the Eighth Amendment indisputably began and ended in terms drawn from its excessive force jurisprudence, i.e., *Whitley*, because it held that Hope's "punitive treatment" amounted to the "gratuitous infliction of 'wanton and unnecessary' pain" that was "clearly prohibit[ed]." *Id.* at 738. Thus, in *Hope*, the Supreme Court applied its excessive force jurisprudence for the first time to a prisoner's allegation that his placement in mechanical restraints was unconstitutional.

We conclude, under *Hope*, that Young's claims should be analyzed under the excessive force test and that such analysis demonstrates that the District Court's grant of summary judgment was in error. We now turn to the task of applying this test to the record before us.[8]

---

[8] While we conclude that the particular claims here concerning the use of mechanical restraints are properly analyzed under the excessive force test, we note that the record in this case, reflecting Young's detention in solitary confinement for over six years, and the DOJ investigative report, detailing prolonged solitary confinement at SCI-Greene and five other Pennsylvania prisons, raise serious concerns under the Eighth Amendment's conditions of confinement test. As Justice Kennedy recently observed, "[y]ears on end of near-total isolation exact a terrible price."

16

B.    Application of the Excessive Force Test In
        Light Of *Hope*

The District Court concluded that there was no Eighth Amendment violation because Young was "known-to-be violent," was exposed to "minimal force," promised to "act out if released," and was not punched, kicked or "otherwise manhandl[ed]" by the COs.  *Young*, 2013 WL 5230796, at *13.  We conclude from our independent review of the videotape and record evidence that the District Court failed to draw all reasonable inferences in Young's favor and that, when those inferences are properly drawn, there are genuine disputes of material fact as to whether the Defendants' use of the restraint chair in this case violated the Eighth Amendment.

Force that is used "maliciously and sadistically for the very purpose of causing harm" violates the Eighth

---

*Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J.L. & Pol'y 325 (2006) (noting the common side-effects of solitary confinement, such as panic, hallucinations, self-mutilation, and suicidal behaviors)); s*ee also Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting) (observing that "it is well documented that . . . prolonged solitary confinement produces numerous deleterious harms").  The record in this case, including details of Young's visual and auditory hallucinations and his numerous suicide attempts, makes palpable "[t]he human toll wrought by extended terms of isolation."  *Davis*, 135 S. Ct. at 2209 (Kennedy, J., concurring).

Amendment. *Whitley*, 475 U.S. at 320-21 (citation and internal quotation marks omitted). While not every "malevolent touch by a prison guard gives rise to a federal cause of action," *Hudson*, 503 U.S. at 9, the "[a]pplication of force by . . . prison guards exceeding that which is reasonable and necessary under the circumstances" may be actionable, *Davidson v. O'Lone*, 752 F.2d 817, 827 (3d Cir. 1984). *See also Giles,* 571 F.3d at 326 (an officer "may not . . . use gratuitous force against an inmate who has been subdued").

As applied to mechanical restraints, the Supreme Court in *Hope* identified particular criteria relevant to the use of excessive force test, holding that (1) where the inmate had "already been subdued, handcuffed, [and] placed in leg irons," and (2) there was a "clear lack of an emergency situation" such that "[a]ny safety concerns had long since abated," then (3) subjecting the inmate to "substantial risk of physical harm" and "unnecessary pain" serves no penological justification. *Hope*, 536 U.S. at 738; *see also Rhodes*, 452 U.S. at 346 ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'") (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). Measured by this yardstick, Young has raised genuine disputes of material fact for a jury to ascertain whether he suffered an Eighth Amendment violation.

First, like the inmate in *Hope*, it appears that Young was already subdued when subjected to mechanical restraint. He was not violent, combative, or self-destructive at any point during the incident leading up to his prolonged confinement in the restraint chair. On the contrary, he was safely secured and shackled after voluntarily complying with the COs' instructions to step into the shower. And immediately prior to being placed in the restraint chair, he was naked and subdued,

18

face down on the ground and held by four COs, with his hands and legs cuffed. *See Hope*, 536 U.S. at 738; *see also Giles*, 571 F.3d at 327 ("striking and kicking a subdued, nonresisting inmate in the side" was not "reasonable or necessary under established law"). Given these facts, "reasonable minds could differ" as to whether Young posed a risk to himself or others when he was placed in the restraint chair. *See J.E. Mamiye*, 813 F.2d at 617 (citations omitted).

While the District Court found that Young's threats of future harm were sufficient to justify his extended placement in the restraint chair, the record, when drawing all inferences in Young's favor, supports a contrary interpretation. Video recording reflects that after being strapped in the chair for nearly eight hours, Young did comment that he would likely be placed back in the restraint chair because "that's just how it is," J.A. 196, and that, following the stress of nearly fourteen hours of confinement, he was agitated and told two COs he would "act out" when released, J.A. 604. When considered on the whole, however, any number of reasonable inferences could be drawn in Young's favor from these statements, not the least of which being (1) that the Defendants had consistently used the chair to punish Young, and (2) that Young was upset and angry about an unjustified, punitive confinement.

Second, there is ample evidence that the events of September 20th did not rise to the level of an "emergency situation," *Hope*, 536 U.S. at 738, despite the District Court's characterization of "a highly energized situation," *Young*, 2013 WL 5230796, at *5 (citation and internal quotation marks omitted). Young only left his cell because a CO inadvertently opened his cell door—far from a prison break; the incident lasted a mere seven minutes, during which two

19

COs chatted and laughed while they watched the scene unfold; and Young voluntarily complied with the COs' instructions within that short time frame. The COs then removed Young, shackled and subdued, from the common area and subjected him in a more controlled space to a prone strip search without resistance. By this point, a reasonable jury could find that "[a]ny safety concerns had long since abated." *Hope*, 536 U.S. at 738.

Finally, there is a dispute of fact as to whether, despite the lack of an emergency situation and the evidence that Young was already subdued, the prison officials exposed Young to a "substantial risk of physical harm" and "unnecessary pain" by placing him in the restraint chair. *See id.* The prison's own regulations authorize use of the restraint chair only for "protection of self or others," J.A. 626, to "prevent an inmate from injuring [himself] or other persons," J.A. 629, and to "safely restrain a combative or self-destructive person," *id.* Yet the COs and prison officials not only placed Young in the restraint chair but did so for nearly fourteen hours, far exceeding the eight-hour maximum permitted without special authorization. *See Hope*, 536 U.S. at 738.

At the outset, Young's restraints were so tight that he cried out in pain, and during the extended period he remained in the restraint chair, Young was naked, with his genitals partially exposed and an air conditioner blowing cold air on him. When he was finally released from this extreme confinement, Young was shaking uncontrollably and complained that he was "cold down to his bones." J.A. 287. His legs, numb from the restricted position his body was forced to endure over fourteen hours, could no longer hold his weight and he had to be wheeled back to the RHU. On this

20

record, Young is entitled to have a jury determine whether he was subjected to "a substantial risk of physical harm" without penological justification and whether the Defendants thus "violated the basic concept underlying the Eighth Amendment." *See Hope*, 536 U.S. at 738 (quoting *Trop*, 356 U.S. at 100) (quotation marks omitted).

In sum, applying the use of excessive force test, analyzing the record under the criteria identified in *Hope*, and drawing all inferences in favor of Young as the nonmoving party, we cannot say that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

C.      The Issue of Qualified Immunity

The Defendants also ask us—in a single sentence—to affirm on the ground of qualified immunity. The District Court did not reach the issue and the availability of the defense was not briefed on appeal. In *Hope*, the Supreme Court held that the officers were not entitled to qualified immunity because their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." 536 U.S. at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (quotation marks omitted). We will leave this issue for the District Court to address in the first instance on remand, considering (1) whether "the state of the law" in 2009, including *Hope*, gave the Defendants "fair warning that their alleged treatment of [Young] was unconstitutional," 536 U.S. at 741, and (2) whether Young's confinement in the restraint chair violated prison regulations of which the Defendants were aware, *see, e.g.*, *id.* at 743-44 (prison officials' violation of Department of Corrections' regulations for restraining inmates at a hitching

21

post was relevant to the question of fair warning); *Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002) ("Prison regulations governing the conduct of correctional officers are . . . relevant in determining whether an inmate's right was clearly established."). *Cf. City & Cnty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1777 (2015) (observing that "an officer act[ing] contrary to her training . . . does not itself negate qualified immunity where it would otherwise be warranted").

D.     Young's Remaining Arguments

Young also argues that the District Court abused its discretion by refusing to stay the summary judgment proceedings pending the issuance of the DOJ's final investigative report and erred in refusing to allocate funds for him to retain a mental health expert. We review for abuse of discretion the District Court's denial of Young's motion to stay and its refusal to allocate funds for an expert. *See Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.*, 544 F.2d 1207, 1215 (3d Cir. 1976) (a district court may stay proceedings "[i]n the exercise of its sound discretion"); *see also* Fed. R. Evid. 706 (giving trial judge broad discretion to appoint expert).

The District Court did not abuse its discretion when it denied Young's motion to stay the proceedings.[9]   At that

---

[9] Young argues that the factors set forth in *Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.,* 87 F.R.D. 53 (E.D. Pa. 1980), weighed in favor of granting a stay:

time, the only issue remaining in the case, by Young's

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Id.* at 56.

While these factors provide a useful analytical framework when deciding whether to stay a civil case pending the outcome of criminal proceedings, Young does not cite, and we have not found, any authority applying them in the context of a motion for stay pending an agency's investigative report. *See, e.g., id.* at 55 (denying stay because there was "no basis in law for the notion that defendants in a criminal prosecution, antitrust or otherwise, have a due process right to stay proceedings in related civil actions lest they be forced to defend themselves on two legal fronts simultaneously"). Indeed, all of the authority cited by Young is in the context of parallel criminal proceedings. *See, e.g.*, *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980); *Walsh Secs., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 527, 529 (D.N.J. 1998). Given the very different issues and interests implicated by such parallel proceedings, we decline to import that framework here.

admission, was "his Eighth Amendment, excessive force challenge to [his] fourteen hour restraint in a restrictive movement chair" at SCI-Greene. J.A. 829 (citation and internal quotation marks omitted). The District Court properly concluded that the DOJ's preliminary investigative report regarding SCI-Cresson was "irrelevant and immaterial to that sole claim" and that Young effectively requested an "indefinite" stay because there was no indication when the DOJ's final report would be issued. *Id.* at 829, 839. While this appeal was pending, however, the DOJ issued its final investigative report, detailing the "dehumanizing and cruel" conditions that attend the Pennsylvania Department of Corrections' ("DOC") use of solitary confinement at six prison facilities, including SCI-Greene, where prisoners are reportedly confined to a cell, less than 100 square feet, for twenty-three hours a day, exposed to unsanitary and inhospitable conditions, and subjected to the excessive use of restraints. Investigation of the Pa. Dep't of Corr. Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities, Appellant's Br., Ex. C, at 4, 9-11.[10] The report observes that solitary confinement commonly includes the "[u]nnecessary and excessive use of

---

[10] Consistent with the Supreme Court's observation concerning a similar report relied upon by the Eighth Circuit in *Hope*, we take judicial notice of the DOJ's final investigative report here. 536 U.S. at 737 n.7 (observing that the DOJ report was not before the District Court but the Eleventh Circuit took judicial notice and referenced it several times in its decision); *see also id.* at 737 (noting that "the court relied on . . . the results of a [DOJ] report that found Alabama's systematic use of the hitching post to be improper corporal punishment.").

[full-body] restraints . . . as a means to discipline prisoners by causing discomfort or pain," *id.* at 11, and concludes that the long-term use of solitary confinement on mentally ill prisoners "violate[s] the Eighth Amendment's prohibition against 'cruel and unusual punishments,'" *id.* at 3.

Young argues on appeal that the final DOJ report is both relevant and admissible. The report reflects, among other things, that rather than providing mental health treatment, "staff members routinely respond to [a] prisoner exhibiting symptoms of . . . mental illness by making his living conditions even more inhospitable," including 24/7 confinement; denying the prisoner bedding material, clothing, and running water; restricting prisoners to even smaller cells; and subjecting them to the "excessive use of restraints." *Id.* at 10-11. It also describes that during their solitary confinement, the prisoners' senses are assaulted with foul smells from the "inadequate sanitation and ventilation"—including the stench of human excrement that mentally ill prisoners smear on the wall and which might remain for days—and loud noises from the "yelling and banging of neighboring prisoners." *Id.* at 9-10. According to the report, most cells have no windows, depriving prisoners of any natural light, though they never enjoy a respite, even at night, from the relentless overhead lighting within their cells. *Id.* at 9. Five days a week, those who are willing to submit to a strip search are "led by tether," "arms and legs shackled," to "an empty and caged outdoor pen" for a single hour. *Id.* at 9-10. Solitary confinement includes a total restriction on contact visitations, *id.* at 10, which means that the only human touch these inmates experience is from the COs shackling them, and a restriction to a single monthly non-contact visitation, *id.*, which means that, but for an hour a

25

month, their only human interactions are limited to the same COs.

According to the report, the use of solitary confinement on mentally ill prisoners "exacerbates their mental illness and leads to serious psychological and physiological harms," "including psychosis, trauma, severe depression, serious self-injury, and suicide," *id.* at 3, 7, and as a result of their prolonged isolation, the prisoners express an inability "to conform their conduct to the prison's rules in a way that would allow them out of their isolation cell" and "accumulate[] years of disciplinary time . . . fear[ing] they [will] never be returned to general population," *id.* at 8. Having been denied mental health services, and with their mental illness exacerbated by prolonged solitary confinement, the prisoners are reportedly subjected to excessive restraints as a form of punishment, with "more than 260 full-body restraint incidents" over eighteen months, of which "almost 75% lasted longer than 7 hours, and 15% lasted longer than 12 hours." *Id.* at 11.

Young notes the many parallels between the findings in the final report and his own experience, pointing out that not only was he subjected to excessive restraint, lasting almost fourteen hours, but also that he suffers from many forms of serious mental illness,[11] that his mental illness has

---

[11] The DOC defines "serious mental illness" as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Appellant's Br. Ex. C at 4-5 (quoting Pa. Dep't Corr., Access to Mental Health Care, Policy 13.8.1, Section 2-Delivery of Mental

been exacerbated by his prolonged solitary confinement, and that his extensive disciplinary history cannot be considered in isolation from his history of mental illness, rendering the final report highly relevant. He also argues that the final report should be deemed admissible, pursuant to the hearsay exception for public records. *See* Fed. R. Evid. 803(8) (a "record or statement of a public office" is admissible "in a civil case" if it sets out "factual findings from a legally authorized investigation" and "the opponent does not show that the source of information nor other circumstances indicate a lack of trustworthiness"). Young cites our decision in *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 669-70 (3d Cir. 2002), as authority for admitting a trustworthy public report containing legal conclusions into evidence pursuant to Rule 803(8).

The Defendants do not dispute that the report is a public document nor do they challenge its trustworthiness, but they argue that it makes "general" and "inadmissible" legal conclusions. Appellees' Br. 29. The Defendants also argue that admission of the DOJ's "opinion" that "restraint chair confinement 'often' is punitive for severely mentally ill RHU inmates held elsewhere" would be "unduly prejudicial in the most fundamental sense." *Id.* at 29-30.

Because the District Court did not address any evidentiary issues pertaining to the final report in deciding Young's motion to stay, it should do so on remand, considering whether the report here, to the extent it contains relevant findings and conclusions, constitutes a trustworthy

---

Health Services § A.1.a.(2) (2013)) (alteration in original) (internal quotation marks omitted).

27

public report admissible pursuant to Rule 803(8) and whether the admission of some or all of the report is not merely prejudicial to the Defendants, but "unfairly prejudicial," as that is the touchstone for exclusion. *Goodman*, 293 F.3d at 670. The parties may renew their evidentiary arguments on remand.

Finally, we agree with the Defendants that the District Court did not abuse its discretion in denying Young's request to appoint a mental health expert pursuant to Federal Rule of Evidence 706 because a court does not have the power to tilt the scales in favor of one litigant by funding its expert witnesses under that Rule. *Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir. 1987). However, the District Court could appoint an expert for the purpose of assisting the Court, and the rule is clear that an expert so appointed should be paid either from "funds provided by law"[12] or "by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs." *Young*, 59 F.3d at 1169-70 (quoting Fed. R. Evid. 706(b)) (internal quotation marks omitted); *see also Boring*, 833 F.2d at 474.

## V. Conclusion

For the foregoing reasons, the District Court improvidently granted summary judgment in favor of the Defendants by failing to apply the Supreme Court's

---

[12] The Western District maintains a "fund to cover reasonable costs" incurred in pro bono civil rights representations. *See* Pro Bono Counsel in Prisoner Civil Rights Cases in the Western District of Pennsylvania, http://www.pawd.uscourts.gov/Pages/ProBonoPC.htm (last accessed August 24, 2015).

28

controlling precedent in *Hope* and failing to draw all reasonable inferences from the facts in favor of Young. The District Court's order of summary judgment will be vacated and the case remanded for further proceedings consistent with this opinion.