**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————

No. 18-1811
—————————

BRIAHEEN THOMAS,
                    Appellant,

v.

DEPUTY SUPERINTENDENT TICE, DEPUTY GARMAN,
CCPM MILLER, and MAJOR HALDERMAN
—————————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(Civ. Action No. 4-16-cv-01487)
District Judge: Hon. Matthew W. Brann
—————————

Argued January 16, 2019

Before: GREENAWAY, JR., SHWARTZ, and PORTER,
*Circuit Judges*

(Filed: January 15, 2020)


James P. Davy **[Argued]**
2362 East Harold Street
Philadelphia, PA 19125

*Counsel for Appellant*

Sean A. Kirkpatrick **[Argued]**
Karen M. Romano
Office of the Attorney General of Pennsylvania
15th Floor, Strawberry Square
Harrisburg, PA 17120

   *Counsel for Appellees*

_____

OPINION

_____

PORTER, *Circuit Judge.*

Briaheen Thomas appeals from the District Court's order granting summary judgment to Deputy Superintendent Eric Tice, Deputy Mark Garman, Correction Classification and Program Manager Timothy Miller, and Major Heather Halderman. For the reasons discussed below, we will affirm in part and reverse in part the District Court's order.

**I**

At all relevant times for this appeal, Thomas was an inmate at SCI-Rockview, in the custody of the Pennsylvania Department of Corrections. On May 31, 2015, Thomas received a friend in the prison's visiting room. As they visited, Thomas's friend handed him a bag of peanut M&Ms. He ate one and then quickly took a drink of soda. One of the guards, believing that Thomas had ingested contraband, immediately handcuffed him and removed him from the visiting room. Thomas was then placed in a dry cell in the prison's infirmary.

A "dry cell" is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes

2

allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

To expedite his release from the dry cell, Thomas was offered laxatives, which he accepted. Over the next four days, Thomas had twelve bowel movements. No evidence of any contraband was found in any of Thomas's bowel movements. Prison staff also x-rayed Thomas on June 1. The x-ray revealed no contraband.

Only the prison's Program Review Committee ("PRC")[1] and facility manager[2] are authorized to determine when to release an inmate from administrative confinement, including from a dry cell. DC-ADM 802 § 4.A. And Pennsylvania Department of Corrections policies require the PRC to review an inmate's administrative placement during the first seven days of confinement and determine whether that placement should continue. DC-ADM 802 § 2.A. On June 4, 2015—day four of Thomas's confinement in the dry cell—the PRC interviewed him at the dry cell.

Following its interview with Thomas, the PRC decided to continue Thomas's confinement in the dry cell for five more days, releasing him on June 9, 2015. Later, Thomas filed an administrative grievance against prison officials, which was ultimately upheld in part and denied in part on administrative appeal. After exhausting his administrative remedies, Thomas filed suit under 42 U.S.C. § 1983, alleging that the members of the PRC had violated his Eighth Amendment right to be free from cruel and unusual punishment. Following discovery, the PRC moved for summary judgment. The Magistrate Judge, finding disputed issues of material fact, recommended that the motion be denied. *Thomas v. Tice*, No. 4:16-CV-01487, 2018 WL 1278586 (M.D. Pa. Jan. 11, 2018). But the District Court

---

[1] The appellees in this case were the members of the PRC. We sometimes refer to them collectively as the PRC.

[2] Deputy Garman was both a member of the PRC and the facility manager at SCI-Rockview. J.A. 314.

3

rejected the Magistrate Judge's report and recommendation and granted the motion for summary judgment. *Thomas v. Tice*, No. 4:16-CV-01487, 2018 WL 1251831 (M.D. Pa. Mar. 12, 2018). Thomas timely appealed from the District Court's order.

## II

The District Court had jurisdiction over Thomas's civil rights action under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction over this appeal from the District Court's final order granting summary judgment under 28 U.S.C. § 1291.

"We exercise plenary review over the grant or denial of summary judgment and apply the same standard the district court should have applied." *Minarsky v. Susquehanna County*, 895 F.3d 303, 309 (3d Cir. 2018) (citation omitted). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact," and thus the movant "is entitled to judgment as a matter of law." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant" and "material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)). "We deny summary judgment if there is enough evidence for a jury to reasonably find" for the nonmoving party. *Minarsky*, 895 F.3d at 309 (citation omitted).

## III

Thomas brought his civil rights action under 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that a person (or persons), acting under color of law, deprived him of a constitutional right. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Thomas alleged that the conditions of his confinement in the dry cell violated his Eighth Amendment right to be free from cruel and unusual punishment. The parties do not dispute that the PRC acted under color of law, but they

4

do dispute whether Thomas's Eighth Amendment rights were violated.

The Eighth Amendment "prohibits any punishment which violates civilized standards and concepts of humanity and decency." *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000) (citations omitted). To prevail against prison officials on a claim that an inmate's conditions of confinement violated the Eighth Amendment, the inmate must meet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious," and (2) the "prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). The first element is satisfied when an inmate is deprived of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). The second element is satisfied when an inmate shows that prison officials acted with deliberate indifference to the inmate's health or safety or conditions of confinement that violated the inmate's constitutional rights. *Id*. at 302–03.

In light of *Farmer*, we adopted a subjective knowledge standard to establish deliberate indifference, requiring a showing that prison officials actually knew of and disregarded constitutional violations. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). This tracks the general standard for liability, which requires a showing that each defendant was personally involved in the alleged wrongdoing. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id*. And a defendant's knowledge of a risk to health and safety "can be proved indirectly by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol*, 256 F.3d 120, 133 (3d Cir. 2001).

When considering whether conditions of confinement violated the Eighth Amendment, we recognize that "the Constitution does not mandate comfortable prisons, and

prisons … which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347. Indeed, even though administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment. *Young*, 960 F.2d at 364.

Thomas's complaint makes two challenges to his confinement in the dry cell. First, he complains of specific deprivations he allegedly suffered during his confinement. Second, he challenges the duration of that confinement. In its order granting summary judgment, the District Court addressed Thomas's challenge to the specific deprivations he allegedly suffered during his confinement. It determined that, even if the specific deprivations allegedly suffered by Thomas violated his Eighth Amendment rights, the PRC members could not be held liable because there was no evidence that they were personally involved in those deprivations. *Thomas*, 2018 WL 1251831, at *5. Because the evidence did not provide a sufficient basis upon which a reasonable jury could conclude that the individual defendants had knowledge of Thomas's conditions of confinement, including whether he was improperly shackled, we agree with the District Court that his condition of confinement claim against these defendants fails.[3]

But the *duration* of Thomas's confinement in the dry cell is a separate issue. *Young*, 960 F.2d at 364 ("The duration and conditions of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards." (citation omitted)). The PRC had the authority to

---

[3] The District Court also concluded that, even if the members of the PRC had been personally involved in the alleged deprivations, they would still be entitled to qualified immunity. *Thomas*, 2018 WL 1251831, at *6–7. Because we agree with the District Court's analysis on personal involvement in the alleged violations, we do not address this alternative ground for the District Court's grant of summary judgment.

end Thomas's administrative confinement in the dry cell and return him to the general population, so PRC members were personally involved in determining the duration of Thomas's confinement in the dry cell. The District Court did not address this secondary claim in its summary judgment order. We will do so now.

As noted above, administrative confinement in a dry cell must serve some penological interest. *See Young*, 960 F.2d at 364. Thomas was originally placed in the dry cell after a guard in the visitation room saw Thomas ingest what the guard suspected may have been contraband. The guard watched Thomas's visitor fidget with something and then offer it to Thomas, which he swallowed with a drink of soda. Thomas explained that the "something" he ate was merely a peanut M&M. But Prison officials assert that hiding drugs in small, multi-colored balloons in bags of peanut M&Ms has become a popular method for introducing contraband into prisons. So the PRC reasonably argues that, under these circumstances, the guard's suspicion that Thomas had ingested contraband was reasonable and warranted Thomas's initial placement in the dry cell.

Thomas argues that this initial suspicion was dispelled by the time the members of the PRC interviewed him four days later, and they knew that there was no longer a penological justification for his continued confinement. Thomas's claim is supported by the undisputed evidence. During the first four days of his confinement, with the aid of laxatives, Thomas had twelve bowl movements. His stool was carefully examined after each bowl movement, and no evidence of contraband was found. Thomas also submitted to an x-ray of his abdominal cavity. The x-ray technician informed Thomas that his x-ray was clean; the only thing inside of him was a bullet near his spine. And although the x-ray report identified a foreign object in the region,[4] it also noted, crucially, that there was no obstruction in Thomas's gastrointestinal tract. During the administrative appeal, Deputy Garman explained: "Dry cell placement was done in good faith after staff reasonably believed [Thomas] had ingested contraband. Policy and

_____

[4] Presumably, this foreign object would have been the bullet.

7

procedures were followed. However, once the x-ray failed to reveal any obstruction, and several bowel movements occurred, [Thomas] should have been released sooner." J.A. 314.

After the initial interview with an inmate in administrative confinement, prison regulations require the PRC to decide whether to end or continue the administrative confinement and to set forth its reason for that decision. *See* DC-ADM 802 § 2.A. Following its June 4, 2015 meeting with Thomas, the PRC decided to continue his administrative confinement, and signed the appropriate forms, but it provided no reason for that decision. In their depositions, members of the PRC could not explain, or even recall, why they had continued Thomas's confinement.

Now the PRC relies on the affidavit of Security Captain Herbert Probst to provide a reason for Thomas's continued confinement in the dry cell. Probst asserts that he was advised by the medical department that Thomas's x-ray revealed an unspecified foreign body, which Probst believed warranted continued placement in administrative custody. But Probst was not a member of the PRC, and there is no evidence that he discussed with the PRC Thomas's continued confinement in the dry cell.

The PRC notes that, under prison regulations, it was required to confer with the security officer and consider his recommendations. Appellees thus ask us to infer that (1) they conferred with the security captain, (2) he recommended continued confinement based on secondhand information from the medical department (despite the negative x-rays and twelve samples of contraband-free stool), and (3) the PRC deferred to his recommendations. We cannot do this. First, our standard of review requires us to draw all reasonable inferences in favor of the nonmovant, and PRC is the movant here. *See Anderson*, 477 U.S. at 255. Second, the evidence before us shows that the PRC failed to follow prison regulations by, for example, failing to record any reason for its decision to continue Thomas's confinement in the dry cell. It would be unreasonable to infer that the PRC strictly adhered to some regulations, such as conferring with the security officer, when it admittedly failed to follow others.

8

We conclude that whether there was a penological justification to continue Thomas's administrative confinement in the dry cell after June 4, 2015 constitutes a disputed issue of material fact. Summary judgment was therefore inappropriate on the duration issue.

**IV**

The PRC members also argue that, even if Thomas's continued confinement without penological justification violated his rights, they would still be entitled to qualified immunity. On the record before us, we must disagree.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (brackets, citation, and internal quotation marks omitted). To prevail against a claim of qualified immunity, the plaintiff need not produce "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted).

Our precedent makes clear that, without some penological justification, an inmate may not be administratively confined in a dry cell. *See Young*, 960 F.2d 351, 364–65; *cf. United States v. Holloway*, 128 F.3d 1254, 1256 (8th Cir. 1997) (dry cell justified when prison officials had reason to believe inmate was smuggling contraband into jail). *See also Rhodes*, 452 U.S. at 347 (conditions of confinement may not be "grossly disproportionate" or "result in pain without any penological purpose"); *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) ("[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering.").

While the penological purpose must always be legitimate, *Ricks v. Shover*, 891 F.3d 468, 475, 476 (3d Cir.

9

2018), we have never determined the exact quantum or nature of penological interest that is needed to justify confinement in a dry cell. But we are satisfied that there must be at least *some* interest. Here, the PRC failed to present evidence of *any* continuing penological interest after its initial interview with Thomas. Without such a penological justification for Thomas's continued confinement in the dry cell, the PRC members are not entitled to qualified immunity.

## V

Our dissenting colleague would go farther and reverse the District Court on Thomas's conditions-of-confinement claim as well as the duration claim. While acknowledging the severity of dry cells generally and Thomas's particularly trying experience, we decline that approach. It is undisputed that the PRC members were not responsible for Thomas's conditions of confinement. J.A. 194–95. Nor is there any record evidence that they actually knew about his alleged deprivations. Thomas's cell door had a window, but the record does not disclose what was visible through the window or whether PRC members actually saw Thomas's deprivations.[5] And while Thomas "yell[ed]" at the PRC as they left his cell, it was not to itemize his various grievances; he was trying to explain the circumstances that led to his placement in the dry cell. J.A. 175–76. Thomas specifically admitted that he never spoke to the PRC about any of his requests for hygienic materials, explaining that his goal "wasn't to stay there and wash my hands there," but rather "to get out of there." J.A. 179. So on a second visit, Thomas again failed to inform the PRC of his alleged deprivations. J.A. 179.

---

[5] For example, toilet paper and sanitizing wipes are provided to the inmate after he uses the bed pan or urine bottle. So the PRC members would not have known of this alleged deprivation merely by visual inspection. Nor would they have known by peering into the cell that Thomas's smock had not been exchanged for a new one; and he did not tell them.

10

The dissent relies heavily on our opinion in *Young v. Martin*, 801 F.3d 172 (3d Cir. 2015).[6] In addition to being factually distinguishable, *Martin* was an excessive-force case decided under the applicable knew-or-should-have-known standard that was rejected for condition-of-confinement cases in *Farmer*. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Even granting *arguendo* the many inferences that our dissenting colleague would draw in Thomas's favor, there is simply no evidence in this record that the PRC members appreciated the same facts and drew the same inferences.[7]

---

[6] The dissent also relies on *Hope v. Pelzer*, 536 U.S. 730 (2002). *Hope* was an excessive force case, and we have since recognized that the Eighth Amendment test for claims related to use of excessive force by mechanical restraints on prisoners described in *Hope* differs from the *Farmer* test for claims related to conditions of confinement. *Young v. Martin*, 801 F.3d 172, 179–80 (3d Cir. 2015). While the *Hope* "Court referred to *Farmer* briefly … its analysis of whether the use of mechanical restraints violated the Eighth Amendment indisputably began and ended in terms drawn from its excessive force jurisprudence." *Id.* at 179. We have not held that mechanical restraints cannot be considered in a conditions-of-confinement case; indeed, the improper use of mechanical restraints may be considered in a conditions-of-confinement case. But reliance on *Hope* here is inapposite.

[7] In *Mammana v. Federal Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019), we recently held, on a motion to dismiss, the plaintiff alleged facts sufficient to assert a viable Eighth Amendment violation. This appeal from a grant of summary judgment is distinguishable because unlike *Mammana*, where we were required to assume the truth of the plaintiff-appellant's factual allegations, here we scoured the evidentiary record and determined there is no evidence in the record allowing us to conclude the PRC participated in, or had actual knowledge of, Thomas's conditions of confinement.

11

## VI

We recognize the importance of administrative confinement in dry cells in preventing the smuggling of contraband into prisons and protecting both inmates and prison staff. So we reiterate that when administrative confinement in a dry cell is not foul or inhuman, and serves a legitimate penological interest, it will not violate the Eighth Amendment. But here the PRC has not presented evidence of any penological justification for Thomas's continued confinement in the dry cell. So we will affirm in part and reverse in part the District Court's order granting summary judgment to the members of the PRC and remand for further proceedings on Thomas's claim that his continued confinement in the dry cell without penological justification violated his constitutional rights.

GREENAWAY, JR., *Circuit Judge*, concurring in part, dissenting in part.

Those who violate our laws forfeit the opportunity to create or control the conditions under which they live. However, our civilized society mandates that these conditions be humane and consonant with the Eighth Amendment. Here, the conditions of confinement in Thomas's dry cell were deplorable, to say the very least, and far more egregious than any set of circumstances to which we or the Supreme Court have lent our imprimatur. As such, while I concur with my colleagues on Thomas's duration claim, I am compelled to dissent from the Majority's holding on Thomas's conditions-of-confinement claim.

## I. THOMAS SUFFERED UNDER INHUMANE CONDITIONS IN THE DRY CELL

Whether considered individually or on their own—and certainly in combination—the conditions Thomas suffered while in the dry cell deprived him of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). I only mention some of these awful conditions here.

While in the dry cell, Thomas was only allowed to wear a paper-thin smock, which did not fit him. The smock was not replaced for a clean one for the duration of his time in the dry cell (over nine days). Despite repeated requests, and in violation of prison policies, he was repeatedly denied a blanket. As a result, he felt cold throughout his stay in the dry cell. His mattress was soiled and did not have a slip covering, sheet, or pillow.

1

The entire nine days that Thomas was in the dry cell, a light on the wall shined on him. Not only was he subject to constant illumination,[1] but he was also continuously handcuffed in a painful position. In particular, his right hand was tightly handcuffed to the metal frame of the bed in a manner that prevented him from even standing and required him to sleep with his right arm outstretched above his head. Although he was given brief periods of respite, his right arm pained him at length, both during and after his dry-cell stay.

Most egregiously, Thomas was repeatedly denied any means of cleaning himself, including after bowel movements and before meals. Despite his requests, and in violation of prison policies, he was never provided toilet paper, sanitizing wipes, or the opportunity to even wash his hands. Provided with the uncontested description of such squalor, we are reminded of the realism of both Dickens and Sinclair but no tale of fiction is this. Can we seriously dispassionately determine that a prisoner laying in filth and excrement deserves our judicial sanction? We should be pushed over the precipice when we note that these conditions forced Thomas to violate his religious obligations as a Muslim to cleanse himself before his daily prayers.

---

[1] We recently recognized that "bright, constant illumination that causes 'grave sleeping problems and other mental and psychological problems' can establish an Eighth Amendment deprivation." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019) (quoting *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996)).

2

## II. THOMAS'S CONDITIONS CLAIM MUST PROCEED TO A JURY

Despite these inhumane conditions, the Majority entirely relieves Defendants[2] of any possible liability by perfunctorily affirming the District Court's determination that they were not personally involved. But, at this summary judgment stage, that cannot be said as a matter of law. Further, qualified immunity should not be extended as a safe haven under these facts. Thomas's conditions claim should proceed to a jury.

### A. There Exists a Genuine Dispute of Material Fact as to What Defendants Actually Knew

As the Majority notes, our precedent reveals that personal involvement can be shown through "actual knowledge and acquiescence." *E.g.*, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). Here, since Defendants undoubtedly acquiesced through inaction, the only question is whether they actually knew about the conditions. This summary judgment record certainly demonstrates that a reasonable jury could indeed conclude such for three independent reasons.

First, Defendants conducted the PRC hearing outside Thomas's dry cell on the fourth day of his confinement there. Although we do not know exactly what their view into the dry cell was, we know enough to conclude that there is a factual

---

[2] I refer to Appellees Eric Tice, Mark Garman, Timothy Miller, and Heather Halderman collectively as "Defendants" throughout this opinion.

dispute about what Defendants saw. In particular, it is undisputed that the hearing was conducted immediately outside the dry cell, Appellees' Br. 14 (stating that the hearing was held "at his [dry] cell door"); that the door to the dry cell had a window through which prison officials on the outside could see Thomas, *id.* at 122–23 (indicating that "[t]here was [a] window" into the dry cell through which a "guard . . . watch[ed Thomas]" all day and night), 136 (noting that, "on the door" to Thomas's dry cell, "[t]here was a window [and] a slot"); and that Defendants were close enough to the dry cell to listen to Thomas's oral complaints, *id.* at 201 (documenting that Thomas participated in the hearing orally).

This evidence is sufficient for a reasonable jury to conclude that Defendants personally viewed, and thus knew, at least some of the conditions about which Thomas complains—his being handcuffed in a painful position; lacking a blanket, toilet paper, and sanitizing wipes; and being subject to artificial illumination. Indeed, we must hold so since, as the Majority also notes, we must draw all reasonable inferences in favor of Thomas, the nonmovant. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

Second, Thomas suggests that he discussed the conditions of his dry cell with Defendants at the PRC hearing. In fact, when asked during his deposition whether Halderman and other Defendants gave him a chance to tell them his "side of things" during the hearing, Thomas stated: "if [Halderman] heard me yelling, then she got it. I was still trying to yell so she could hear me as [Defendants] continued to walk on." App. 175–76. This statement can be reasonably interpreted to mean that Thomas informed Defendants about the deplorable

4

conditions in his dry cell—and they thus had actual knowledge about the conditions.

To be sure, Defendants contend that Thomas never complained about his confinement conditions to them. Of course, we do not have authoritative evidence as to what Thomas told Defendants chiefly because, contrary to prison policies, Defendants did not write a summary of Thomas's oral statements and, as far as the Court is aware, apparently failed to take notes of any kind during the hearing. *See* App. 39. Nonetheless, in support of their position, Defendants point to deposition testimony where Thomas was asked whether, when he saw Defendants on an unspecified date, he spoke "to any of them about [his] request . . . to wash [his] hands or for a shower [or] for soap." *Id.* at 179. Thomas responded in the negative. *See id.*

But this sole statement, inquiring only about some of his complaints, does not preclude a determination that Defendants were personally involved in the many indecent conditions of Thomas's dry cell. Even if Thomas did not tell Defendants about his requests to wash his hands, for a shower, or for soap, he still could have told—and generally indicates he did tell—them about the other grievous conditions he was experiencing—including his pain resulting from being continuously handcuffed, cold from lacking a blanket and wearing a smock too small, unsanitary state from being denied toilet paper and sanitizing wipes, and lack of sleep from being constantly illuminated. At a minimum, drawing all inferences in Thomas's favor, we are compelled by our jurisprudence to determine that there exists a genuine dispute as to many material facts regarding what exactly Thomas told Defendants and the knowledge that may reasonably be imputed to them.

5

On its own, that precludes summary judgment on Thomas's conditions claim.

Put simply, we cannot say as a matter of law that Defendants did not have personal knowledge of, and thus were not personally involved in, the conditions of Thomas's confinement in the dry cell. Especially since we must make all reasonable inferences in Thomas's favor, this factual dispute precludes summary judgment.[3] In entirely overlooking these facts, the Majority makes a glaring error.

## B. Defendants Are Not Entitled to Qualified Immunity

Upon summarily affirming the District Court's personal involvement analysis, the Majority explicitly declines to determine whether Defendants are entitled to qualified immunity on Thomas's conditions claim. But because, as

---

[3] This conclusion accords with our precedent, as we have previously recognized that a party's state of mind is "typically not a proper issue for resolution on summary judgment," *Young v. Quinlan*, 960 F.3d 351, 360 (n.21) (quoting *Wilson v. Seiter*, 893 F.2d 861, 866 (6th Cir. 1990), *vacated on other grounds*, 501 U.S. 294 (1991)), because it is "inherently a question of fact which turns on credibility." *Id.* (citing *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991); *Miller v. FDIC*, 906 F.2d 972, 974 (4th Cir. 1990); *Nat'l Fire Ins. Co. v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1437 (6th Cir. 1987); 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2730 (1983 & 1991 Supp.)), *superseded by statute on other grounds as stated in Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 2000).

explained above, we cannot determine as a matter of law that Defendants were not personally involved in the conditions of Thomas's dry cell, we must answer this qualified immunity question. In so doing, our precedent demands that we resolve this issue in Thomas's favor.

As the Majority notes, qualified immunity does not shield a government official where she has "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted). As I view it, precedent from our Court and the Supreme Court clearly establishes that the conditions Thomas faced in the dry cell taken together violate the Eighth Amendment. *See Rhodes*, 452 U.S. at 347 (indicating that conditions of confinement, "alone, or in combination, may deprive inmates of the minimal civilized measure of life's necessities").

Most directly applicable is our decision in *Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992). There, Kenneth Young, a federal inmate, was placed in a dry cell like Thomas's for 96 hours. *See id.* at 355. During this confinement, Young was not allowed to wash his hands before eating nor provided with toilet paper upon defecating. *See id.* Moreover, during the first 29 hours of his confinement in the dry cell, Young was denied permission to leave the dry cell to urinate or defecate and thus relieved himself in a corner of his cell. *See id.*

After the lower court granted summary judgment for the defendant prison officials, we reversed. *See id.* at 353. In relevant part, we held that the totality of conditions in the inmate's confinement in the dry cell violated the Eighth Amendment. *See id.* at 365. In particular, we reasoned:

7

[W]e cannot condone dehumanizing treatment such as was allegedly given Young by [] prison officials once he was confined to the dry cell. *Riley* [*v. Jeffes*], 777 F.2d[ 143,] 148 [(3d Cir. 1985)] (where plaintiff's complaint alleges facts which, if proven, would entitle plaintiff to relief under the Eighth Amendment, dismissal of complaint was inappropriate). Even if Young was properly confined to the dry cell, [prison] officials do not have a license to impose unconstitutional conditions upon him. *See Ingraham v. Wright*, 430 U.S. 651, 667[] (1977) (Eighth Amendment proscribes punishment grossly disproportionate to the severity of the crime); *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989); *United States v. Martorano*, 866 F.2d 62, 69 (3d Cir. 1989).

When viewed in their totality, the alleged actions of [the] prison officials—not allowing Young to leave his cell more than once to defecate or urinate over a period of several days, not providing Young with a plastic urinal for 29 hours, not allowing Young to empty his urinal more than twice, not allowing Young to wash his hands before eating, not allowing Young to bathe or shower, not providing Young with toilet paper despite his diarrhea, not providing Young with water to drink, suggesting instead that he drink his urine, and the mocking taunts by guards and their threats to chain Young to a steel slab if he complained about his conditions—would if proved demonstrate a violation of the basic

8

concepts of humanity and decency that are at the core of the protections afforded by the Eighth Amendment. It would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days in a stench that not even a fellow prisoner could stand.

The conditions that Young was allegedly made to endure for four days are all the more revolting considering that Young is HIV positive, and, hence, more susceptible to infection and disease. *See Tillery* [*v. Owens*], 907 F.2d [418,] 428 [(3d Cir. 1990)]. Such a denial of even basic sanitation in our opinion is "cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose[.]" *Estelle* [*v. Gamble*], 429 U.S. [97,] 103 [(1976)]. We find that Young has sufficiently alleged that the actions of certain [] prison officials "resulted in unquestioned and serious deprivation of basic human needs," *Rhodes*, 452 U.S. at 347[], and as such, Young has satisfied the objective component of a claim for violations of the Eighth Amendment.

*Young*, 960 F.2d at 364-65.

*Young* thus clearly established in 1992 that an inmate's extended confinement in a dry cell where she, among other things, cannot wash her hands before eating, use toilet paper after defecating, bathe, or shower violates the Eighth Amendment. This principle is directly applicable here: the conditions of Thomas's confinement violated clearly

9

established Eighth Amendment law given their similarity to the conditions of Young's confinement.[4]

The Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002), further tips the scale in Thomas's favor. There, Larry Hope, a state inmate, fell asleep during a "morning bus ride to [his] chain gang's worksite." *Id.* at 734. Consequently, he "was less than prompt in responding to an order to get off the bus" and eventually got into a "wrestling match with a guard." *Id.* As a result, Hope was handcuffed, placed in leg irons, and transported back to the prison where he was cuffed on a "hitching post." *Id.* "The guards made him take off his shirt, and he remained shirtless all day while the sun burned his skin." *Id.* at 734–35. He was chained to the post for seven hours and was given water only once, denied bathroom breaks, and taunted by the guards. *See id.* at 735.

---

[4] Defendants seek to elude the inevitable grasp of *Young*'s reach by highlighting that Young, unlike Thomas, was HIV positive and thus had a heightened risk of infection from being in proximity to his bowel movements. But Young's HIV status was but one aspect we considered in that case—and that, too, after we already deemed that the totality of the other conditions of his confinement constituted an Eighth Amendment violation. 960 F.2d at 365. Using Defendants' logic, no Eighth Amendment violation would ever be clearly established given the inevitable factual novelties in the real-world scenarios that come before the courts. For this reason, the Supreme Court has recognized that "officials can still be on notice that their conduct violates established law even in," as here, "novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). If anything, this case presents such a circumstance.

On these facts, the Supreme Court concluded that an "Eighth Amendment violation is obvious." *Id.* at 737–38 (internal quotation marks and citation omitted). The Supreme Court explained:

> [T]he respondents knowingly subjected [Hope] to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a [seven]–hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation. The use of the hitching post under these circumstances violated the "basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100[] (1958). This punitive treatment amounts to gratuitous infliction of "wanton and unnecessary" pain that our precedent clearly prohibits.

*Hope*, 536 U.S. at 738 (footnote omitted).

*Hope* therefore clearly established in 2002 that extended and painful handcuffing of an inmate violates the Eighth Amendment. That is precisely what Thomas endured here, where his right hand was painfully handcuffed throughout his nine days in the dry cell, save for occasional and fleeting periods of respite.[5]

---

[5] As with *Young*, Defendants attempt to undermine *Hope*'s applicability by asserting that Hope was handcuffed outdoors

11

Finally, our recent decision in *Mammana v. Federal Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019), further demonstrates that Defendants cannot avail themselves of qualified immunity. There, Anthony Mammana, a federal inmate, alleged that he was "deprived of his clothing, provided only 'paper like' coverings instead, denied bedding [and toilet paper], and exposed to low cell temperatures and constant bright lighting for four days." *Id.* at 374. We held that the conditions under which Mammana suffered—many of which are identical to those Thomas endured here—violated the Eighth Amendment. *See id.* at 372–73. Although *Mammana* postdates the events giving rise to this appeal, it relies on an array of cases decided well before the instant case. *See id.* at 372 (citing, inter alia, *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

In short, then, qualified immunity does not shield Defendants from Thomas's conditions claim. Among others, *Young*, *Hope*, and the cases on which *Mammana* relies clearly established before Thomas's confinement in the dry cell that the conditions he suffered there taken together violate the Eighth Amendment. Hence, Thomas's conditions claim must proceed to a jury.

## III. THE LAW MANDATES A FULL REVERSAL

"The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop v. Dulles*, 356

---

in the sun whereas Thomas was not. But, as *Hope* itself explains at length, the key question in the qualified immunity arena is whether the law gives a defendant fair warning that her actions are unconstitutional. *See Hope*, 536 U.S. at 741. Here, Defendants had such fair warning.

U.S. 86, 100 (1958) (plurality opinion). Here, Thomas was housed in a dry cell in utterly undignified conditions. On that, the record is clear. As to whether Defendants were personally involved in these conditions, the record reveals a genuine dispute of material facts that precludes summary judgment. Qualified immunity, moreover, is of no aid to Defendants given the ample precedent deeming similar conditions as violative of the Eighth Amendment. I would vacate in full the District Court's grant of summary judgment and remand to the District Court for trial on both Thomas's duration and conditions claims. Given my divergence of viewpoint, I dissent from the Majority's disposition of Thomas's conditions claim.